1  KRISTINA L. BURROWS, SBN 221363
   AMY Y. CHOI, SBN 229501
2  STEPHANIE E. HAFFNER, SBN 194192
   CALIFORNIA RURAL LEGAL
3  ASSISTANCE, INC.
   242 N. Sutter Street, #411
4  Stockton, California 95202
   Telephone: (209) 946-0609
5
   MICHAEL RAWSON, SBN 95868
6  DEBORAH COLLINS, SBN 154532
   CALIFORNIA AFFORDABLE HOUSING
7  LAW PROJECT OF THE PUBLIC
   INTEREST LAW PROJECT
8  449 15TH Street, Suite 301
   Oakland, California 94612
9  Telephone: (510) 891-9794, Ext. 156

10
11 S. LYNN MARTINEZ, SBN 164406
   WESTERN CENTER ON LAW & POVERTY
12 449 Fifteenth Street, Suite 301
   Oakland, California 94612
13 Telephone:(510) 891-9794, Ext. 125

   Attorneys for Plaintiffs
14
   [List of Counsel Continued on Next Page]
15

16

17          IN THE UNITED STATES DISTRICT COURT

18       FOR THE EASTERN DISTRICT OF CALIFORNIA

19
   RICHARD PRICE, et al.,                )  CASE NO. Civ.S-02-0065 LKK JKM
20                                        )
                  Plaintiffs,             )  AMENDED MEMORANDUM OF
21                                        )  POINTS AND AUTHORITIES IN
            vs.                           )  SUPPORT OF PLAINTIFFS' MOTION
22                                        )  TO AMEND PRELIMINARY
   CITY OF STOCKTON, CALIFORNIA, et )       INJUNCTION
23 al.,                                   )
                                          )  Date:  March 21, 2005
24             Defendants.                )  Time:  10:00 a.m.
   _____)  Courtroom No.  4
25

26

27

28

---

Amended Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Amend Preliminary Injunction

1

2  DEANNA R. KITAMURA, SBN 162039
   RICHARD ROTHSCHILD, SBN 67356
3  WESTERN CENTER ON LAW & POVERTY
   3701 Wilshire Blvd., Suite 208
4  Los Angeles, California 90010-2809
   Telephone: (213) 487-7211
5

6  ILENE J. JACOBS, SBN 126812
   CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
7  P.O. Box 2600
   Marysville, California 95901
8  Telephone (530) 742-7235

9  JACK DANIEL, SBN 133498
   CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
10 2115 Kern Street, Suite 370
   Fresno, California 93721
11 Telephone: (559) 441-8721

12
   D.SCOTT CHANG, SBN 146403
13 Post Office Box 1299
   Belmont, California 94002
14 Telephone: (650) 947-9906
   Facsimile : (650) 948-4159
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

Page

3  INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 1

4  PROCEDURAL BACKGROUND ...................................................... 3

5  STATEMENT OF RELEVANT FACTS ............................................... 4

6  I.  DEFENDANTS CONTINUE TO THREATEN REMOVAL OF OVER 350 SRO
      UNITS FROM THE AFFORDABLE HOUSING STOCK AS PART OF THEIR
7     DOWNTOWN REDEVELOPMENT PROJECT ............................... 4

8  II. DEFENDANTS' FAILURE TO ADOPT A LAWFUL REPLACEMENT
      HOUSING PLAN HAS A DISPARATE IMPACT ON PERSONS WITH
9     DISABILITIES AND RECIPIENTS OF PUBLIC BENEFITS .................... 7

10 STANDARD OF REVIEW ........................................................ 8

11 ARGUMENT .................................................................. 9

12 I.  PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE
      MERITS OF THEIR REPLACEMENT HOUSING CLAIMS UNDER THE
13    CALIFORNIA COMMUNITY REDEVELOPMENT LAW ..................... 9

14     A.  Defendants' Replacement Housing Obligations under State Law ............ 9

15     B.  Defendant Stockton Redevelopment Agency Has an Obligation Pursuant
           to the CRL to Replace the Lower Income Residential Units That Have
16         Been Removed for the Downtown Redevelopment Project ................ 10

17         1.  The Downtown Redevelopment Project Is Subject to a Written
               Agreement Between the City and the Agency, and the Agency Has
18             Provided Substantial Financial Assistance to the Downtown
19             Project ..................................................... 11

20         2.  The Agency Has Been Significantly Involved in All Phases of the
               Downtown Redevelopment Project ............................ 13

21     C.  Defendant Redevelopment Agency Has Failed to Comply with the
           Replacement Housing Obligations of the CRL ......................... 15
22

23         1.  Defendant Agency Failed to Timely Adopt a Replacement Housing
               Plan ...................................................... 15
24

25         2.  Defendant Agency Failed to Comply with the Affordability
               Requirements of HSC §33413(a) .............................. 17

26         3.  Defendant Redevelopment Agency Has Failed to Assure a Priority for
               Displaced Persons for Affordable Housing Units to Be Produced or
27             Replaced ................................................... 19

28

II.   PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCEEDING ON
THE MERITS OF THEIR FEDERAL FAIR HOUSING ACT CLAIM . . . . . . . . . . . . . 20

 A. The Fair Housing Act Provides Plaintiffs a Right of Action to Challenge
Defendants' Failure to Comply with Federal and State Replacement
Housing Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

 B. Actions Having a Discriminatory Effect on Persons with Disabilities
Violate the Fair Housing Act.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

 C. Defendants' Actions Have a Discriminatory Effect on Disabled Persons . . . . . . 23

  1. Defendants' Illegal Conduct Has Adverse Impact . . . . . . . . . . . . . . . . . 23

   a. Defendants' Failure to Comply with Their Replacement
Housing Obligations Has a Statistically Significant Effect . . . . . 23

   b. Other Factors Underscore the Severity of the Adverse
Impact of Defendants' Illegal Conduct  . . . . . . . . . . . . . . . . . . . . . 24

  2. Defendants' Conduct Has the Ultimate Effect of Furthering
Segregation of Disabled Persons in the Stockton Area  . . . . . . . . . . . . . 26

 D. No Compelling Governmental Interest Can Justify Defendants' Illegal
Conduct  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

III.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE
MERITS OF THEIR STATE FAIR HOUSING LAW CLAIM  . . . . . . . . . . . . . . . . . . 29

 A. The Court May Grant Plaintiffs a Preliminary Injunction under FEHA to
Prevent Discrimination Based on Disability or Source of Income  . . . . . . . . . . 29

 B. Defendants' Actions Have a Discriminatory Effect under FEHA on
Disabled Persons  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

 C. Defendants' Actions Have a Discriminatory Effect under FEHA on
Persons with Income from General Relief and on Persons with Income
from SSI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

  1. General Relief  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

   a. There Is Compelling Evidence of Discriminatory Effect . . . . . . . 31

   b. Evidence That Defendants Intended to Displace General
Relief Recipients  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

   c. Defendants' Conduct Has the Ultimate Effect of Furthering
Segregation of General Relief Recipients in the Stockton
Area  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

  2. Supplemental Security Income  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

D.      Defendants Cannot Rebut Plaintiffs' Evidence of Disproportionate Effect   . . . . 34

IV.     PLAINTIFFS WILL CONTINUE TO SUFFER IRREPARABLE INJURY
UNLESS DEFENDANTS ARE RESTRAINED BY THIS COURT; THE
BALANCE OF HARDSHIP TIPS DECIDEDLY IN THEIR FAVOR . . . . . . . . . . . . . . 34

A.      The Court Holds Broad Power to Grant the Preliminary Relief Necessary
to Prevent Further Irreparable Harm from Defendants' Discriminatory
Acts   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

B.      The Balance of Hardship Tips Sharply in Plaintiffs' Favor . . . . . . . . . . . . . . . . 37

V.      NO ADDITIONAL BOND SHOULD BE REQUIRED OF PLAINTIFFS . . . . . . . . . . 37

CONCLUSION   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

Page

## CASES

*Angell v. Zinsser,*
   473 F.Supp. 488 (D. Conn. 1979) ................................................ 35

*Albermarle Paper Co. v. Moody,*
   422 U.S. 405 (1975) ............................................................ 35

*Atkins v. Robinson,*
   545 F.Supp. 852 (E.D. Va. 1982), affd, 733 F.2d 318 (4th Cir. 1984) ................... 35

*Banks v. Perk,*
   341 F.Supp. 1175 (N.D. Ohio 1972),
   *aff'd in part and rev'd in part,* 473 F.2d 910 (6th Cir. 1973) ......................... 36

*Betsey v. Turtle Creek Associates,*
   736 F.2d 983 (4th Cir. 1984) .......................................... 23,24,28,31

*Broadmoor San Clemente Homeowners Assn. v. Nelson,*
   25 Cal.App.4th 1 (1994) ........................................................ 30

*Brown v. Smith,*
   55 Cal.App.4th 767 (1997) ...................................................... 29

*Brown v. Artery Organization, Inc.,*
   654 F.Supp. 1106 (D. D.C. 1987) ................................................ 35

*Burlington Northern Ry. Co. v. Department of Revenue,*
   934 F.2d 1064 (9th Cir. 1991) ............................................... 35,36

*California ex rel. Van de Kamp v. Tahoe Regional Planning Agency,*
   766 F.2d 1319, *modified* 775 F.2d 988 (9th Cir. 1985) ........................... 37,38

*Caribbean Marine Services Co. v. Baldridge,*
   844 F.2d 668 (9th Cir. 1988) ..................................................... 8

*Columbus Board of Education v. Penick,*
   443 U.S. 449 (1979) ............................................................ 25

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills,*
   321 F.3d 878 (9th Cir. 2003) ..................................................... 8

*Diaz v. San Jose Unified School District,*
   733 F.2d 660 (9th Cir. 1984),
   *cert. denied,* 471 U.S. 1065 (1985) ............................................. 25

*Gamble v. City of Escondido,*
   104 F.3d 300 (9th Cir. 1996) .................................................... 22

*Gladstone Realtors v. Village of Bellwood*,
    441 U.S. 91 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21,22

*Gresham v. Windrush Partners, Ltd.*,
    730 F.2d 1417 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Halet v. Wend Investment Co.*,
    672 F.2d 1305 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Havens Realty Corp. v. Coleman*,
    455 U.S. 370 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21,22

*Huntington Branch, NAACP v. Town of Huntington*,
    844 F.2d 926 (2nd Cir.), *aff'd* 488 U.S. 15 (1988) . . . . . . . . . . . . . . . . . . . . . . . . 22

*Inland Mediation Board v. City of Pomona*,
    158 F.Supp.2d 1120 (C.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Keith v. Volpe*,
    618 F.Supp. 1132 (C.D. Cal. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 23,24,26,27,30,34

*Keith v. Volpe*,
    858 F.2d 467 (9th Cir. 1988), *cert. denied*, 493 U.S. 813 (1989) . . . . . . . . . . . . . . . 22,24,30,31

*Langlois v. Abington Housing Authority*,
    234 F.Supp. 2d 33 (D.C. Mass. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Latinos Unidos de Chelsea En Accion (LUCHA) v. Secretary of Hous. & Urban Dev.*,
    799 F.2d 774 (1st Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Llanos v. Estate of Coehlo*,
    24 F.Supp. 2d 1052 (E.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Louisiana v. United States*,
    380 U.S.145 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Marable v. Walker*,
    704 F.2d 1219, 1221 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights*,
    558 F.2d 1283 (7th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23,24,26,27,28,34

*Oakland Tribune, Inc. v. Chronicle Publishing Co.*,
    762 F.2d 1374 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Park View Heights v. City of Black Jack*,
    605 F.2d 1033 (8th Cir. 1979),
    *cert. denied*, 445 U.S. 905 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Pfaff v. Department of Hous. & Urban Dev.*,
    88 F.3d 739 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

///

*Price v. City of Stockton*,
390 F.3d 1105 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4,11,21

*Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977),
*cert. denied sub nom, Whitman Area Improvement Council v. Resident Advisory Board*,
435 U.S. 908 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Smith v. Anchor Bldg. Corp.*,
536 F.2d 231 (8th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Trafficante v. Metropolitan Life Ins. Co.*,
409 U.S. 205 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23,35

*Trailer Train Co. v. State Bd. of Equalization*,
697 F.2d 860 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. City of Black Jack*,
508 F.2d 1179 (8th Cir. 1974),
*cert. denied*, 422 U.S. 1042 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22,23,28

*Vietnamese Fishermen's Assocaition v. Knights of the Ku Klux Klan*,
543 F.Supp. 198 (D.C. Tex. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*,
429 U.S. 252 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Walker v. City of Lakewood*,
272 F.3d 1114 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Zuch v. Hussey*,
394 F.Supp. 1028 (E.D. Mich. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35,36

**FEDERAL STATUTES**

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,21

42 U.S.C. §3601 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3,20

42 U.S.C. §3604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

42 U.S.C. §3613 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21,36

42 U.S.C. §5304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,3,16,20

**STATE STATUTES**

Govt. Code §7260 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Govt. Code §12900 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3,29

Govt. Code §12955 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29,34

Govt. Code §12955.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Govt. Code §12955.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Govt. Code §12989.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Govt. Code §12989.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Govt. Code §65008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Health and Safety Code §33000 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Health and Safety Code §33071 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Health and Safety Code §33411.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,10,19,24,27,30

Health and Safety Code §33413 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,9,10,14,15,17,19,20

Health and Safety Code §33413.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,10,15,17,20,32

Health and Safety Code §50052.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Health and Safety Code §50053 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Health and Safety Code §50105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Health and Safety Code §50106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**FEDERAL RULES**

Federal Rules of Civil Procedure, Rule 65(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

2       Plaintiffs seek to have the preliminary injunction amended to prevent the demolition or

3 conversion of the downtown single room occupancy hotels and apartments (SRO) that

4 Defendants removed from the affordable housing market in 2001 and 2002, pending trial of the

5 action, unless Defendants adopt a lawful replacement housing plan. Plaintiffs have a strong

6 likelihood of succeeding on their state redevelopment and state and federal fair housing claims,

7 and the balance of hardship Plaintiffs will suffer in the absence of a lawful plan tips decidedly in

8 their favor.

9       During the pendency of Defendants' appeal, they pursued their downtown redevelopment

10 project, acquiring at least seven of the downtown SRO hotels. When the Ninth Circuit

11 determined that Plaintiffs could not enforce the replacement housing provisions of HCDA

12 through 42 U.S.C. §1983, Defendant Redevelopment Agency took quick action to facilitate

13 demolition of one of the hotels Defendants had acquired, the Toni Hotel. In violation of the

14 Housing and Community Development Act, 42 U.S.C. §5304 (HCDA) and the California

15 Community Redevelopment Law (CRL), Health and Safety C. (HSC) §33000, *et seq.*,

16 Defendants did not adopt a lawful replacement housing plan and did not assure a priority for any

17 replacement units for the persons they displaced.

18       Prior to removal of lower income units from the affordable housing market as part of a

19 redevelopment project, Defendant Redevelopment Agency (Agency) must adopt a replacement

20 housing plan that will ensure the units are replaced within four years of removal pursuant to HSC

21 §§ 33413 and 33413.5. All persons that were displaced by Defendants' redevelopment activities

22 are entitled to a priority for those replacement units pursuant to HSC §33411.3. As this Court

23 has already determined, and the Ninth Circuit affirmed, Defendants' closure, acquisition, and

24 threatened demolition and conversion of the downtown SRO hotels is all part of Defendants'

25 West End Redevelopment Project. Defendant Agency substantially participated in and

26 financially assisted the project. Just as Defendants failed to comply with their duty to adopt a

27 replacement housing plan pursuant to HCDA, however, Defendant Redevelopment Agency

28

Amended Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Amend Preliminary Injunction

1   skirted its replacement housing obligations under state law.

2     Plaintiffs' failure to adopt replacement housing plans also violate state and federal fair

3   housing statutes – claims this Court did not reach in deciding plaintiffs' motion for a preliminary

4   injunction.  Aside from whether Plaintiffs can enforce the replacement housing provisions of

5   HCDA through 42 U.S.C. §1983, this Court and the Ninth Circuit agree that Defendants had a

6   statutory obligation to adopt a replacement housing plan before implementing their

7   redevelopment scheme.  Defendants' failure to timely adopt an adequate plan under state or

8   federal law has deprived a disproportionate number of persons with disabilities of housing,

9   including Plaintiffs, in violation of federal and state fair housing laws (42 U.S.C. §3601 *et seq.*

10   and Govt. C. §12900 *et seq.*).  Plaintiffs *can* enforce their fair housing rights.  Defendants also

11   violated the state fair housing statute by discriminating against the displaced residents on the

12   basis of their source of income.  A disproportionate number of those persons relied on General

13   Relief (GR) or Supplemental Security Income (SSI) as their source of income.

14     A preliminary injunction prohibiting the removal of SRO hotels from the affordable

15   housing market, until Defendants adopt a lawful replacement housing plan, is necessary to ensure

16   that defendants immediately cease their unlawful and discriminatory activities.  Had Defendants

17   adopted a plan three or four years ago, as required by federal and state law, respectively, the

18   required "replacement" units would be complete or nearing completion.  Affordable housing

19   delayed is housing denied, and that denial constitutes irreparable harm.  By failing to adopt an

20   adequate plan, and taking steps to demolish the Toni Hotel without one, even before the Ninth

21   Circuit's remand, Plaintiffs and all other displaced persons have been deprived of their right to a

22   priority for those replacement units.  Thus, over 350 displaced persons, in addition to being

23   deprived of timely and adequate relocation assistance benefits, will suffer the irreparable harm of

24   being denied the right to return to their "redeveloped" community.  By comparison, the only

25   harm Defendants will suffer is further delay in completing their redevelopment project – a delay

26   they could have avoided by complying with their statutory obligations.

27     Accordingly, the preliminary injunction should be amended to restrain Defendants from

28

-2-

demolishing or otherwise removing the downtown residential units that were subjected to Defendants' code enforcement activities until Defendants adopt a lawful replacement housing plan that complies with state and federal law.

## PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint in January 2002, seeking declaratory and injunctive relief and a writ of mandate for Defendants' violations of state and federal relocation assistance, replacement housing, fair housing and other statutes as a result of Defendants' displacement of hundreds of downtown residents and closure of nine downtown SRO's. *See* Complaint filed January 10, 2002. Plaintiffs sought a Preliminary Injunction in February 2002 to restrain Defendants from vacating, converting and demolishing those residential units without providing adequate relocation assistance to the displaced residents or adopting and implementing relocation assistance and replacement housing plans. *See* Notice of Motion and Motion for Preliminary Injunction and supporting documents filed February 26, 2002. Plaintiffs sought the Preliminary Injunction pursuant to HCDA, the California Relocation Assistance Act, Govt. C. §7260, and federal and state fair housing statutes, 42 U.S.C. §3601 *et seq*. and Cal. Govt. C. §12900 *et seq*.

Finding that Plaintiffs were likely to succeed on the merits of their Section 104(d) and state relocation assistance claims, and that the balance of hardships tipped decidedly in plaintiffs' favor, this Court issued a Preliminary Injunction on May 2, 2002, as modified on June 14, 2002, that restrained Defendants, among other things, from demolishing or converting any of the downtown residential properties until they adopt and implement a valid replacement housing plan in accordance with HCDA. *See* Order dated May 2, 2002 at 36 ¶2 (PI Order); Order dated June 14, 2002 at 1 ¶1. Because it found that Plaintiffs were likely to prevail on their HCDA claims, the Court did not reach plaintiffs' fair housing claims. *Id*. at 33-34.

Defendants appealed the Preliminary Injunction. *See* Notices of Appeal filed May 29, 2002 and June 14, 2002. On December 6, 2004, the Ninth Circuit affirmed the Orders with respect to the relocation assistance requirements. *Price v. City of Stockton*, 390 F.3d 1105, 1118 (9th Cir. 2004). It reversed and remanded as to the Court's prohibition of demolition or conversion of the hotels absent a replacement housing plan on the grounds that Plaintiffs cannot

-3-

1   enforce the replacement housing provisions of HCDA.   390 F.3d at 1113-14, 1118.  The Ninth

2   Circuit issued its mandate to this Court on December 29, 2005.

3                          **STATEMENT OF RELEVANT FACTS**

4          This Court is well familiar with the facts in this case, and Plaintiffs will limit their factual

5   summary to an update of Defendants' redevelopment project as it relates to the lower income

6   units that were vacated and closed by Defendants, and the discriminatory effect of Defendants'

7   failure to adequately plan for replacement housing.

8   I.     **DEFENDANTS CONTINUE TO THREATEN REMOVAL OF OVER 350 SRO**
           **UNITS FROM THE AFFORDABLE HOUSING STOCK AS PART OF THEIR**
9          **DOWNTOWN REDEVELOPMENT PROJECT.**

10         Defendants continue to pursue their downtown redevelopment plan by acquiring,

11  demolishing, and threatening to demolish many of the SRO hotels that were closed in 2001 and

12  2002 through Defendants' aggressive code enforcement campaign.  Sixteen of the 29 properties

13  on Defendants' 2001 acquisition list are downtown SRO hotels and lower income apartments,

14  including the Commercial, Cosmos, Delta, Earle, El Tecolote, Fair, James, La Verta, Mariposa,

15  Merrill, Oxford, Phoenix, Steve's, Terry and Toni Hotels and Hunter Apartments.  *See* PI Order

16  at 2-3 and fn. 2.  All 16 of these residential properties were included in defendants' code

17  enforcement sweep.  *Id.* at 3-4.

18         *Closed Hotels*.  Between July 2001 and December 2002, Defendants vacated and closed

19  nine of the properties on their acquisition list (the Commercial, Cosmos, Earle, El Tecolote,

20  James, La Verta, Mariposa, Steve's and Terry Hotels) plus the Land Hotel (not on its acquisition

21  list), resulting in the removal of 351 lower income residential units from the West End Project

22  Area.  *Id.* at 4 and fn. 3; *see also* Declaration of Deborah Collins in Support of Plaintiffs' Motion

23  to Amend Preliminary Injunction (Collins Dec.) ¶11, Ex. 10 at 637.   All but the Cosmos Hotel,

24  with 28 units, remain closed and padlocked as of the filing of this motion.   Declaration of

25  Kristina Burrows in Support of Plaintiffs' Motion to Amend Preliminary Injunction (Burrows

26  Dec.) ¶3, Exs. 1-10; *see also* Declaration of Amy Choi in Support of Plaintiffs' Motion to

27  Amend Preliminary Injunction (Choi Dec.) ¶3, Ex. 1.

28         *Acquisitions*.  At least seven of the closed hotels are now owned by the City.  Consistent

                                          -4-

with their redevelopment scheme, Defendants acquired the Terry Hotel and commenced an eminent domain action against the Commercial Hotel in 2002. *See* PI Order at 25; *see also* Burrows Dec. ¶14, Exs. 22, 23. Both were purportedly needed for public parking purposes. *Id.*; *see also* Collins Dec. ¶15, Ex. 14.[1] The Toni Hotel was acquired on March 26, 2002 to support parking for the Cineplex development (currently referred to as the City Centre Cinema Project. Burrows Dec. ¶¶4, Exs. 11, 12; ¶12, Ex. 20. The City acquired El Tecolote on May 9, 2002, and the Earle Hotel on July 11, 2002. Burrows Dec. ¶¶5, 6, Exs. 13, 14. The City Council approved an agreement to purchase the Main Hotel, also to provide parking opportunities, in January 2003. Collins Dec. ¶ 15, Ex. 14. On October 5, 2004, Defendants obtained a condemnation order in their eminent domain action against the La Verta Hotel. Burrows Dec. ¶8, Exs. 16. The Land Hotel was acquired as part of the settlement and dismissal by the property owner of an action in this Court.[2]

*Demolition and Conversion.* Defendants demolished Hunter Apartments in April 2002, just prior to issuance of the Preliminary Injunction, for a loss of 24 lower income units. Collins Dec. ¶10, Ex. 9 at 570; Choi Dec. ¶3, Ex. 1. In January 2003, the CHAT reported that demolition of the Mariposa and Steve's Hotels awaits "Federal Court ruling." Collins Dec. ¶11, Ex. 10 at 642. Although the Toni Hotel corrected purported code enforcement violations (*Id.* at 638), Defendants took steps to approve demolition on December 14, 2004, even before the Ninth Circuit issued its mandate in this case. Burrows Dec. ¶12, 13, Exs. 20, 21.

Specifically, Defendant Agency tardily adopted a replacement housing plan for the eight Toni Hotel units to permit demolition to occur. *Id.* However, its "plan" fails to comply with the CRL as discussed in Argument I *infra*, at 9-20. The Agency also has failed to assure that persons previously displaced by the downtown project will have a priority for the purported eight "replacement" units. *See* Burrows Dec. ¶12, 13, Exs. 20, 21; Declaration of Stanford Cobbs in

---

[1] In January 2003, staff reported to the City Council that it was still in the process of acquiring the Commercial Hotel for additional parking. *Id.*

[2] The court is requested to take judicial notice of the pleadings and record in the action, *Portale v. City of Stockton*, Case No. 02-CV-00065 LKK-KJM.

Amended Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Amend Preliminary Injunction

1   Support of Plaintiffs' Motion to Amend Preliminary Injunction (Cobbs 2005 Dec.), ¶4;

2   Declaration of Dwain Henderson in Support of Plaintiffs' Motion to Amend Preliminary

3   Injunction (Henderson 2005 Dec.), ¶4. (attesting that they have received no notice from

4   Defendants of their right to a priority for the Stockton Hotel units).  All 155 units at the Hotel

5   Stockton are restricted for seniors.  Collins Dec. ¶13, Ex. 12 at 1425; ¶15, Ex. 24.  Roughly 30%

6   of the persons listed on Defendants' Relocation Assistance Log of persons that were displaced

7   from the downtown hotels are over the age of 55.  *See* City's  Relocation Assistance Log,

8   attached to Declaration of Professor John Logan in Support of Plaintiffs' Motion to Amend

9   Preliminary Injunction (Logan Dec.), Ex. 1-B; *see also* Declaration of Stephanie Haffner in

10   Support of Plaintiffs' Motion to Amend Preliminary Injunction ¶3 (Haffner 2005 Dec).  Thus,

11   rather than receiving a priority for a unit, the non-senior displaced persons (approximately 240),

12   including plaintiffs Baker, White, and Watson, would simply be ineligible for a senior-restricted

13   unit.[3]

14        On December 15, 2004, Defendants' counsel advised Plaintiffs that Defendants have "no

15   plans *over the next week* to demolish any of the downtown hotels it has acquired. . . . [but] does

16   plan to [demolish the Toni Hotel] in the next three to four weeks."  Collins Dec. ¶21, Ex. 20

17   (emphasis added).  As promised, the Toni Hotel was razed shortly thereafter, resulting in the

18   permanent loss of eight more SRO units.  Burrows Dec. ¶3, Ex. 10.  As Defendants' Downtown

19   Strategic Action Plan demonstrates, and this Court previously found, many more of the lower-

20   income downtown residential units appear destined for demolition or conversion.  *See* PI Order at

21   23-25; Declaration of Stephanie Haffner in Support of Plaintiffs Motion for Preliminary

22   Injunction filed February 26, 2002 (Haffner 2002 Dec.) ¶8, Ex. 6 at 8.

23        Even hotels that survived the code enforcement phase of Defendants' scheme are still at

24   risk of demolition.  For example, in 2003, the Agency designated a square block that includes the

25   Delta Hotel property as a Master Development Area and obtained a development proposal to

26

27        [3]*See* Declarations of George Baker, Lucinda Watson and Lance White in Support of Plaintiffs
     Motion for Preliminary Injunction filed February 26, 2002 at ¶2 (plaintiffs Baker and Watson are 41
28   years of age; plaintiff White is 36).

construct a gated and landscaped parking lot that would extend right through the Delta parcel.
Collins Dec. ¶ 17, 18, 19, Exs. 16, 17, 18.[4]    Thus, at least 351 lower income units were removed
from the affordable housing market as a result of the "code enforcement" closures in 2001 and
2002.  Thirty-two lower income units (Hunter and Toni) have been demolished.  Another seven
to eight SRO's, with a total of 349 units,  already acquired by Defendants remain at imminent
risk of demolition.

## II.    DEFENDANTS' FAILURE TO ADOPT A LAWFL REPLACEMENT HOUSING PLAN HAS A DISPARATE IMPACT ON PERSONS WITH DISABILITIES AND RECIPIENTS OF PUBLIC BENEFITS.

As this Court found in May 2002, a disproportionate number of the residents who have
been impacted by Defendants' actions are disabled.  PI  Order at 5.  In fact, the percentage of
disabled households that were displaced by Defendants without the benefit of a relocation
assistance or replacement housing plan is nearly *double* the citywide percentage of disabled
households.  Declaration of  Professor John Logan in Support of Plaintiffs' Motion to Amend
Preliminary Injunction (Logan Dec.), ¶3, Ex. 1 at 6.  Defendants' own relocation assistance log
of displaced persons reflects that 17.3% of the displaced households receive disability income in
the form of SSI.  *Id.*, Ex. 1 at 6-7 and Table 3; *see also* Choi Dec. ¶4, Ex. 2 at 115-16.[5]  This
compares to only 9.4% of households citywide that receive SSI.  Logan Dec. ¶3, Ex. 1 at 5 and
Table 1.

In addition, a disproportionate number of the hotel residents that were displaced,
including Plaintiffs George Baker and Stanford Cobbs, relied on public benefits as their source of
income.  *See, e.g.,*  Declaration of Stanford Cobbs in Support of Plaintiffs' Motion for
Preliminary Injunction filed February 26, 2002 (Cobbs 2002 Dec.) ¶4 (SSI); Declaration of
George Baker in Support of Plaintiffs' Motion for Preliminary Injunction filed February 26, 2002

---

[4]The Delta Hotel is located at the corner of Miner and San Joaquin Streets. *See* Haffner 2002 Dec. ¶ 10, Ex. 8.

[5]Two of those disabled households include Plaintiffs Stanford Cobbs and Richard Price. *See* Cobbs 2005 Declaration ¶ 3; Declaration of Richard Price in Support of Motion for Preliminary Injunction, filed February 26, 2002, ¶4, 5.

-7-

(Baker 2002 Dec.) ¶4 (GR).  Defendants' relocation log reflects that of the 353 displaced persons listed, 147 (or 46.8%), depended on GR.  Logan Dec., Ex. 1 at 6.  This compares with a GR recipient rate of less than 0.5% at the time of displacement for the City of Stockton as a whole.  *See* Haffner 2002 Dec. ¶28, Ex. 26 at 3-36 - 3-39.  When Temporary Assistance to Needy Families (formerly AFDC) is added to the equation, 179 of the 353 displaced persons (or 49%), depended on some form of welfare.  Logan Dec. Ex. 1 at 6-7, Table 3.

Predictably, as a result of Defendants' aggressive code enforcement campaign, the number of GR recipients residing in the zip code where the SRO's are located (95202), dropped by 132 persons.  *Id*. at 5-6.  By contrast, the number of GR recipients "in the rest of Stockton (including zip codes extending beyond city limits) was almost unchanged."  *Id*.  In fact, Defendants encouraged staff to find people housing *outside* of Stockton and to ask the displaced persons if they wanted to leave town.   Choi Dec. ¶4, Ex. 2 at 37-41.

## STANDARD OF REVIEW

Plaintiffs meet the standard for issuance of a preliminary injunction.  The Ninth Circuit has adopted two tests for determining the propriety of a preliminary injunction.  The moving party must demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party.  *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 881* (9th Cir. 2003).  These two formulations are not different tests but represent two points on a sliding scale in which the required probability of success decreases as the degree of irreparable harm increases.  *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir. 1985).  In addition, a court in either formulation of the test  must also take into account the public interests that are implicated by the relief sought when it is balancing the harms.  *Caribbean Marine Services Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).

Plaintiffs make the requisite showing that they merit a preliminary injunction at any point along the above described continuum.

///

-8-

1

**ARGUMENT**

2  **I.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE
3        MERITS OF THEIR REPLACEMENT HOUSING CLAIMS UNDER THE
        CALIFORNIA COMMUNITY REDEVELOPMENT LAW.**

4       Plaintiffs are substantially likely to succeed on their Ninth Claim for relief from

5  Defendants' violation of the CRL.  Defendant Agency's failure to timely plan for replacement of

6  the SRO units that have been removed from the affordable housing market as part of Defendants'

7  downtown redevelopment project violates the CRL, and deprives the individual Plaintiffs and all

8  other persons displaced from the downtown SRO's of timely replacement of the units and their

9  right to a priority for occupancy of the replacement units.

10      **A.   Defendants' Replacement Housing Obligations under State Law.**

11      A fundamental purpose of the CRL is "to *expand* the supply of low- and moderate-

12  income housing."  Health & Safety Code §33071 (emphasis added).   To assure that the

13  development of affordable housing occurs as part of a redevelopment plan, the Legislature

14  imposes "inclusionary" or "production" requirements on redevelopment agencies, mandating that

15  specified percentages of new residential development must be affordable to lower income

16  families.  HSC §33413(b).  In addition, like HCDA, the CRL requires *replacement* of lower

17  income housing that is destroyed or removed from the housing market as part of a redevelopment

18  project:

19      " Whenever dwelling units housing persons and families of low or moderate
        income are destroyed or removed from the low- and moderate-income housing
20      market as part of a redevelopment project that is subject to a written agreement
        with the agency or where financial assistance has been provided by the agency, the
21      agency shall, *within four years* of the destruction or removal, rehabilitate, develop,
        or construct, or cause to be rehabilitated, developed, or constructed, for rental or
22      sale to persons and families of low or moderate income, an equal number of
        replacement dwelling units that have an equal or greater number of bedrooms as
23      those destroyed or removed units at affordable housing costs within the territorial
        jurisdiction of the agency. . . ."

24  HSC §33413(a) (emphasis added).[6]  The "replacement" units must be available at an affordable

25  housing cost at the same or a lower income level as the persons displaced from the units that are

26

27      [6]The "replacement housing" obligation  is over and above the "inclusionary" obligation.
28  HSC §33413(b)(3).

-9-

destroyed or removed.  *Id.*[7]  The replacement units also must be restricted by recorded covenants to remain affordable at such income categories for the longest feasible time, and not less than 55 years for rental units or 45 years for homeownership units.  HSC §33413(c)(1).

In order to assure timely replacement of the lower income units at appropriate affordability levels, a redevelopment agency must adopt a replacement housing plan well in advance of removing the units:

> "Not less than 30 days prior to the execution of an agreement for acquisition of real property, or the execution of an agreement for the disposition and development of property, or the execution of an owner participation agreement, which agreement would lead to the destruction or removal of dwelling units from the low- and moderate-income housing market, the agency shall adopt by resolution a replacement housing plan. . . . "

HSC §33413.5.  The plan must specify the general location of the replacement housing units, an adequate means of financing those units, a finding that approval by the voters under Article XXIV of the California Constitution is not required prior to development of the replacement units, the number of units housing lower income persons and families that will be removed from the market, and the timetable for meeting the plan's relocation, rehabilitation and replacement housing obligations.  *Id.*

Finally, whenever any lower income housing units are developed pursuant to HSC § 33413, a redevelopment agency must require by contract or other appropriate means that the lower income families displaced by the redevelopment project shall have a priority for renting or buying the replacement housing.  HSC §33411.3.  The agency also must maintain a list of all persons entitled to such a priority, and may establish reasonable rules for determining the order or priority on the list.  *Id.*

**B.    Defendant Stockton Redevelopment Agency Has An Obligation Pursuant to the CRL to Replace The Lower Income Residential Units That Have Been Removed for the Downtown Redevelopment Project.**

In applying the provisions of HSC §33413(a), there can be little doubt  that plaintiffs are

---

[7]If the units were removed or destroyed between September 1, 1989 and January 1, 2002, 75% of the replacement units were required to be affordable at the same or lower income levels as the persons displaced.  For any units removed or destroyed after January 1, 2002, 100% of the replacement units must be affordable to the persons displaced.  *Id.*

substantially likely to succeed on their claim that the downtown residential units housed lower income persons, and that Defendants removed those lower income units from the affordable housing market as part of the downtown redevelopment project.  This Court found in issuing the Preliminary Injunction, and the Ninth Circuit affirmed, that an abundance of evidence supports plaintiffs' claims that the aggressive code enforcement campaign by Defendants' Community Health Action Team (CHAT) against the downtown residential hotels,[8] acquisition of those hotels, and threatened demolition and conversion of the hotels to parking lots or other uses are all part and parcel of Defendants' West End Redevelopment Plan ("downtown redevelopment project"):

> The [district] court also found . . . that the City's "redevelopment activities, which included code enforcement, notices of vacating and demolition, and the acquisition of hotels through purchase and eminent domain proceedings, amounted to a 'single undertaking.'" . . . Indeed, "the circumstances strongly suggested" that 'the City's goals to redevelop downtown through acquisition of buildings in the area . . . precipitated code enforcement." . . . Accordingly, the court concluded that Plaintiffs' displacement occurred "in connection with" downtown redevelopment activities.  None of these findings are clearly erroneous; indeed, all are amply supported by evidence in the record.

*Price v. City of Stockton*, 390 F.3d at 1116, quoting PI Order at 2-5, 21-25.

The evidence also is clear that there was substantial Agency financial assistance and involvement in removal of the SRO hotels as part of the redevelopment project.

### 1. The Downtown Redevelopment Project Is Subject To A Written Agreement Between The City and The Agency, and The Agency Has Provided Substantial Financial Assistance to the Downtown Project.

Defendants City and Redevelopment Agency adopted the West End Urban Renewal Project Redevelopment Plan in 1961, and amended it in 1991 to authorize the Redevelopment Agency to acquire all real property in the project area for redevelopment purposes.[9]  PI Order at

---

[8]It also cannot be seriously disputed that the SRO hotels subjected to Defendants' redevelopment project all housed lower income persons. *See* PI Order at 2-3, fn. 2.

[9]Under the 1991 plan, the City is required to cooperate with the Redevelopment Agency and to take all necessary actions, including acquisition of real property inside the project area, to fulfill the plan purposes of preventing the recurrence or spread of conditions causing blight.  Haffner 2002 Dec. ¶6, Ex. 4 at 29.  The plan further authorizes the Redevelopment Agency to reimburse the City for acquisition, demolition and site preparation. *Id.*

-11-

2. The City claims that it established a "capital program" to purchase and demolish buildings in order to expand available parking in the City (PI Order at 2), and this Court has found a strong likelihood that CDBG funds were also used to partially fund the code enforcement phase of the project. *Id*. at 21. However, those are not the only funds that have been used to further the downtown redevelopment project.

Pursuant to an agreement between the City and the Redevelopment Agency, the City transferred $14.5 million in federal funds to the Redevelopment Agency to carry out the downtown redevelopment project. In July 1998, Defendant City applied to HUD for an Economic Development Initiative (EDI) grant and Section 108 loans to further the downtown redevelopment project, including "property assembly activities" to support the development of a multi-modal rail station, renovation of the Hotel Stockton, development of a multi-screen Cineplex, renovation of the Fox Theater, and an affordable housing development. Collins Dec. ¶3, Ex. 2. In its application, the City acknowledges that "[t]he EDI and Section 108 funded projects will require the relocation of approximately 200 residential units and 37 businesses. . . ." *Id*. at DEF 03155. The City also identifies the Redevelopment Agency as the lead player in its redevelopment scheme: "The Redevelopment Agency has a long history of playing the coordination role and as the Agency responsible for the comprehensive project implementation. . . ." *Id*. at DEF 03185.

The Redevelopment Agency contributed over $2.7 million as matching funds in support of the EDI application. *Id*. at DEF 03183, 03191. HUD awarded the City $14.5 million in November 1998, consisting of a $1 million EDI grant, a $500,000 grant for a Brownfields Economic Development initiative (BEDI), and a $13 million Section 108 loan. Collins Dec. ¶¶4, 5, Exs. 3, 4. Repayment of the Section 108 loan was secured with the City's program income from the Community Development Block Program (CDBG) and the tax increment revenue the Redevelopment Agency projected it would receive over a 20-year period. Collins Dec. ¶3, Ex. 2 at 03154-55; *Id*. at ¶¶5, 8, Exs. 4, 7.

In May 2000, the City and the Redevelopment Agency entered into a Subrecipient Agreement whereby the City agreed to grant the $14.5 million to the Redevelopment Agency to

-12-

1    carry out the redevelopment project, and the Agency agreed to assist the City, as needed, in

2    repaying the Section 108 loan debt. Collins Dec. ¶6, Ex. 5 at 14682-83. Defendants

3    subsequently sought and obtained an extension of time from October 31, 2001 until October 31,

4    2002 to expend the federal funds. *Id.* ¶9, Ex. 8. During that extension period, a majority of the

5    code enforcement activities against the SRO's occurred.

6        Thus, the downtown redevelopment project is plainly subject to an agreement and Agency

7    financial assistance that would (and, in fact, did) result in the displacement of at least 353 lower

8    income residents, and the removal of at least 351 SRO units from the housing market.

9             **2.**     **The Agency Has Been Significantly Involved in All Phases**
                    **of the Downtown Redevelopment Project.**

10        Consistent with its responsibility for "comprehensive project implementation," Defendant

11    Agency has been a key player in all phases of the downtown redevelopment scheme.

12        *Parking Study.* Coinciding with the City's application for millions of federal dollars to

13    support downtown redevelopment, the Agency commissioned the parking study in 1998.

14    Haffner 2002 Dec. ¶18, Ex. 16 at 3-2. That study recommended the use of parking lot

15    development as a "redevelopment tool". *Id.*

16        *Code Enforcement.* The Agency actively participated in the code enforcement activities

17    that precipitated the vacating and closing of ten downtown residential hotels. Defendant Lewis

18    (City Manager/Agency Executive Director) and Pinkerton (Director of the Housing and

19    Redevelopment Department (HRD))[10] are both members of CHAT's "internal committee" and

20    are credited with CHAT's "accomplishments". Choi Dec. ¶5, Ex. 3 at 539; Collins Dec. ¶11, Ex.

21    10 at 622. At least three more HRD staff members participated in the CHAT core group. (Code

22    Enforcement Officers Lamar, Sallady, and Zerweck). Choi Dec. ¶5, Ex. 3.

23        *Downtown Action Team.* Defendants Mark Lewis, Steven Pinkerton, and Redevelopment

24    Manager, Jim Rinehart, are all members of the Downtown Action Team (DAT). Choi Dec. ¶7,

25    Ex. 5. The DAT is charged with implementing Defendants' Downtown Strategic Action Plan

26

27        [10]The Redevelopment Agency is staffed by the City's Housing and Redevelopment

28    Department (HRD). Collins Dec. ¶2, Ex. 1.

that calls for the elimination of substandard SRO housing and reexamination of zoning to consider changes to limit the number of downtown SRO's. Haffner 2002 Dec., Ex. 6 at 1, 47; *see also* PI Order at 24.

*Acquisition*. The Agency also participated in the City's acquisition of the SRO hotels. Defendants Lewis and Pinkerton, identified as Defendants' real property negotiators, attended the City Council's closed session in June 2001 regarding acquisition of twenty-nine downtown properties. PI Order at 24. In urging the City Council to proceed with eminent domain actions against the Commercial and Terry Hotels, Defendant Pinkerton reiterated the Agency's recommended "redevelopment tool" – that downtown revitalization cannot occur without parking, so the hotel lots must be purchased in advance of the development. *See* Haffner 2002 Dec. ¶12, 13, 14 and Exs. 10, 11, 12 thereto. Defendant Pinkerton and other HRD staff sent appraisal notices to hotel owners that preceded acquisition and/or eminent domain actions. *See, e.g.*, Supplemental Declaration of Stephanie Haffner in Support of Plaintiffs' Reply Memorandum filed March 25, 2002 ¶7, Ex. 4.

*Demolition*. Tellingly, the "City" purchased the Toni Hotel in order to demolish it for "public parking". *See* Declaration of Mark Lewis in Opposition to Plaintiffs' Motion for Preliminary Injunction filed March 18, 2002 ¶22; Burrows Dec. ¶12, Ex. 20. The parking is, in fact, intended to support the Redevelopment Agency's disposition and development agreement with the developer of the City Centre Cinema. Burrows Dec. ¶12, Ex. 20. When Defendants moved quickly after the Ninth Circuit's decision issued to demolish the Toni Hotel, it was the Redevelopment Agency that adopted a replacement housing plan, albeit an inadequate and untimely one.

Thus, Defendant Agency's financial assistance, Subrecipient Agreement with the City and comprehensive involvement in the redevelopment project requires it to replace any of the lower income residential units that were or are removed for the downtown redevelopment project pursuant to HSC §33413(a). Its belated attempt to plan for the replacement of only the eight Toni Hotel units, just prior to demolition, falls far short of its obligations.

///

-14-

**C.   Defendant Redevelopment Agency Has Failed to Comply With The Replacement Housing Obligations of the CRL.**

Defendant Agency violated the CRL by failing to adopt a replacement housing plan for the SRO's within the time line mandated by HSC §33413.5, failing to adopt an adequate replacement housing plan for the Toni Hotel units, and evading its obligation to assure that the persons displaced to accommodate the downtown redevelopment project actually receive a priority for any replacement units developed pursuant to HSC §33413.

**1.   Defendant Agency Failed to Timely Adopt a Replacement Housing Plan.**

Defendant Agency has four years, under state law, from the time the lower income units are removed from the housing market to replace them. HSC §33413(a). In order to meet that deadline, an agency must *plan* for replacement well in advance of implementing the redevelopment project. *See* HSC §33413.5. In the replacement plan for the Toni Hotel units, Defendants claim that the CRL requires adoption of a replacement housing plan "at least 30 days prior to implementing a project that may displace low and moderate-income residents." Burrows Dec. ¶12, Ex. 20 at 425. Defendants are wrong. HSC §33413.5 does not permit the Agency to wait until the bulldozers are poised at the door of the lower income housing. It requires adoption of the replacement housing plan:

> "not less than 30 days *prior to the execution of an agreement for acquisition of real property, or the execution of an agreement for the disposition and development of property. . . that would lead to the destruction or removal of [the] dwelling units. . . .*"

(*Id.*; emphasis added.)

Defendants have long since removed at least 351 lower-income residential units from the affordable housing market. Between June 2001 and May 2, 2002, Defendants closed nine of the SRO hotels and demolished the Hunter Apartments. *See* PI Order at 4, fn. 3; *see also* Collins Dec. ¶10, Ex. 9 at 570. As of February 3, 2005, most of those hotels *remain* closed, and additional lower income units have been acquired and demolished. Thus, at a minimum, the replacement units should be available between June 2005 and May 2006, and the plan to meet

1   that deadline should have been adopted years ago.[11]

2   Defendant City and Redevelopment Agency knew in May 2000 when they entered into
3   the Subrecipient Agreement that at least 200 residential units were intended to be removed for
4   the redevelopment project. Indeed, the original Disposition and Development Agreement
5   (Cineplex DDA) for the City Centre Cinema also was entered into between the Agency and the
6   developer on May 2, 2000. Collins Dec. ¶20, Ex. 19. As the Agency admits in its December 14,
7   2004 Staff Report concerning the replacement plan for the Toni Hotel, the Toni site was acquired
8   by the City to provide a parking site for the City Centre Cinema. Burrows Dec. ¶12, Ex. 20.
9   Thus, at a minimum, a replacement plan for the Toni Hotel units was required to be adopted in
10  April 2000 – 30 days before the Subrecipient Agreement and Cineplex DDA were executed.[12]

11  Similarly, many of the other hotels were removed from the market in 2001 as part of the
12  CHAT campaign, and Defendants simultaneously commenced their acquisition activities. As the
13  Agency admits, it "previously entered into *agreements* with the developer of certain downtown
14  *projects* to provide additional downtown parking for the *projects*." Burrows Dec. ¶12, Ex. 20 at
15  424. Like the Toni Hotel, the City also had acquired a number of the other hotels in 2002 for
16  public "parking" purposes. Indeed, the project "plan" has been to create the parking ahead of the
17  downtown development and the SROs have long been targeted to provide that parking.

18  Nonetheless, Defendant Agency waited until December 14, 2004, on the eve of
19  demolition, to adopt any replacement housing plan, and of course, that plan purports to replace
20  only eight SRO units. Where no replacement housing plan exists for the other 350-plus units,
21  those units cannot be removed:

22   A dwelling unit whose replacement is required by Section 33413 but for which no

23

24  [11]Of course, had defendants complied with their statutory duty under HCDA, most of the
    units would already have been replaced. Under HCDA, the units must be replaced within three years
25  of the demolition or conversion. 42 U.S.C. §5304(d).

26  [12]Moreover, the offer to purchase the Toni was made on November 27, 2001 (Collins Dec.
    ¶14, Ex. 13), and the Toni Hotel site was deeded to the City on March 26, 2002. Burrows Dec. ¶4,
27  Exs. 11, 12. Thus, execution of the acquisition agreement, which also can trigger the replacement
28  planning obligation, occurred sometime before March 26, 2002.

1   replacement housing plan has been prepared, shall not be destroyed or removed
    from the low- and moderate-income housing market until the agency has by
2   resolution adopted a replacement housing plan.

3   HSC §33413.5.

4       A replacement housing plan that purportedly provides for replacement of only eight of the

5   downtown units is woefully inadequate to comply with the CRL. It is untimely, plans to replace

6   an insufficient number of units, and as we next discuss, fails to comply with the affordability

7   requirements of HSC §33413(a).

8                   **2.   Defendant Agency Failed to Comply with the Affordability
                        Requirements of HSC §33413(a).**

9       By stalling adoption of the Toni Hotel replacement plan until December 2004, the plan

10  for even those eight units is rendered fundamentally flawed. A critical aspect of a replacement

11  housing plan is to assure that the replacement units will be affordable to persons at the same or

12  lower income levels as the residents that were displaced. HSC §33413.5. The Agency speculates

13  in its plan, that the *former* residents of the Toni Hotel were all very low income. Burrows Dec.

14  ¶12, Ex. 20 at 430. Accordingly, it plans to replace eight units affordable to *very low income*

15  persons. This raises two significant problems.

16      Defendants' "assumption" that all of the Toni Hotel residents had very low incomes does

17  not comply with §33413(a). First, the former residents of the Toni Hotel were just as likely to be

18  persons with "extremely low", rather than very low incomes. A replacement unit affordable to a

19  very low income person is not affordable to an extremely low income person. To explain, a very

20  low income one-person household in Stockton would currently have an income of not more than

21  $1608 per month (50% of the area median income (AMI)).[13] Such person is assumed by state

22  income and affordability statutes to be able to spend up to 30% of their income for housing costs.

23  HSC §§50052.5, 50053. Thus, the rent for a "very low income" household of one could be set

24  as high as $482 (30% of 50% of AMI). *See* HSC §50105. An *extremely low* income household,

25  with an income of not more than $962 per month, can afford a maximum rent of $288 (30% of

26

27      [13]State CDBG and HOME Table of 2004 Income Limits posted on the California Department
28  of Housing and Community Development website.

30%). *See* HSC §50106. Therefore, if rent levels are set at very low income, an extremely low income family will effectively be deprived of a replacement unit. Hence, the critical need for advance planning *before* the residents are displaced in order to ensure the units are actually affordable to *their* income level.

Particularly troubling is that the Defendant Agency had to base its replacement plan on an "assumption" at all. Defendants remain subject to this Court's Preliminary Injunction *not* to vacate *any* of the downtown hotels until it adopts a relocation assistance plan. *See* PI Order at 36. The Toni Hotel was never vacated as a result of the code enforcement campaign. It was cited for code violations, and according to the CHAT, as of January 2003, those violations had been repaired. Collins Dec. ¶11, Ex. 10 at 638. In November 2004, however, the City Council approved a relocation assistance settlement agreement with a restaurant that was displaced from the Toni Hotel based on the City's acquisition of the site in 2002 for a parking lot. Burrows Dec. ¶9, 10, Exs. 17, 18. The staff report concerning relocation of that business reflects that no relocation assistance plan was adopted for *residents* of the hotel because "[a]ll of the residential tenants have moved from the Toni Hotel." *Id.* at 16. Moreover, a Downtown Action Team document reveals, in August 2004, that residents of the Toni Hotel had been "relocated". Burrows Dec. ¶7, Ex. 15. Thus, there is every indication that the residents of the Toni Hotel were displaced without a relocation assistance plan. Moreover, Defendants' own Relocation Assistance Log indicates that no relocation assistance, as ordered by this Court, was provided to residents of the Toni Hotel.[14]

Defendants' failure to adopt a timely and adequate replacement housing plan for the Toni Hotel is strong evidence of the need for an amendment of the preliminary injunction to prohibit any further demolition of the downtown hotels in the absence of a replacement housing plan that fully complies with the CRL.

///

---

[14]Defendants' relocation assistance log lists relocation assistance information regarding residents of the Commercial, Cosmos, Earle, El Tecolote, Terry, Hunter Apartments, James, La Verta, Land, and Mariposa Hotels. *See* Logan Dec. Ex. 1-B.

### 3.   Defendant Redevelopment Agency Has Failed to Assure A Priority for Displaced Persons for Affordable Housing Units to be Produced or Replaced.

Defendant Agency also has failed to comply with HSC §33411.3 which requires it to assure by contract or other reasonable means that any persons it displaces will receive a priority for any replacement units produced or replaced pursuant to HSC §33413.   In keeping with that obligation, the Agency must maintain a list of all persons it has displaced.

Defendants failed to maintain a list sufficient to ensure that it would even be able to contact the persons it displaced so as to assure that they enjoy the benefit of their right to a priority for a replacement unit.   In fact, as discussed above, Defendants have already lost nearly four years of the four-year deadline imposed by state law to actually provide replacement housing.   It also has "lost" contact with many of the persons it displaced.   Defendants' relocation assistance log indicates that Defendants did not keep track of all the hotels from which persons were displaced.   *See* footnote 14, *supra*.   Moreover, the log indicates that the whereabouts are unknown of roughly 50 of the persons fortunate enough to have made it to the "relocation log."   Similarly, approximately 100 persons that were displaced may never have made it to Defendants' relocation assistance log at all as a result of Defendants' delay in providing any notice of the right to relocation assistance.   *See* Order Enforcing Preliminary Injunction dated February 7, 2005 at 20.   Thus, it is apparent that Defendant Agency failed to maintain a list of displaced persons as required by HSC §33411.3.

In addition, although Defendants included a provision in the Hotel Stockton regulatory agreement that any persons the Agency displaces will have a right to a priority for a unit at the Hotel Stockton (Collins Dec. ¶13, Ex. 12 at 1430), Defendants have done nothing to ensure compliance.   In fact, the named Plaintiffs in this case were never notified by Defendant Agency or the City that they had any right to a priority for a unit at the Hotel Stockton.   *See, e.g.*, Henderson 2005 Dec. ¶4; Cobbs 2005 Dec.   ¶4.   Rather, when Plaintiffs' counsel learned of the potential availability of the Hotel Stockton units, she contacted the developer directly to assist several plaintiffs in being added to the waiting list, including Plaintiffs Henderson and Cobbs.   Burrows Dec. ¶¶ 16-19.   To date, Plaintiffs Henderson and Cobbs have received no information

-19-

from the developer or an opportunity to apply for a unit at the Hotel Stockton. Henderson 2005 Dec. ¶4; Cobbs 2005 Dec. ¶4.

Finally, all 155 "replacement" units at the Hotel Stockton are restricted to seniors and will only be affordable to very low income persons. As discussed above, like plaintiffs George Baker, Lucinda Watson, and Lance White, approximately 70% of the persons recorded on Defendants' Relocation Assistance Log are *not* seniors. Similarly, approximately half of the persons displaced are recipients of public benefits, many of them, like Stanford Cobbs, with extremely low incomes. Cobbs 2005 Dec. ¶3; Henderson 2005 Dec. ¶3. Thus, a "priority" for a unit that is restricted to seniors and not affordable to those displaced persons is rendered meaningless.

Accordingly, the Preliminary Injunction should be modified to prevent Defendant Agency from continuing to avoid its replacement housing obligations under the CRL.

## II.  PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCEEDING ON THE MERITS OF THEIR FEDERAL FAIR HOUSING ACT CLAIM.

Defendants' failure to plan for housing to replace the hotels slated for conversion or demolition as required by state and federal replacement housing laws has a significant discriminatory effect on persons with disabilities, and defendants have no compelling purpose in avoiding compliance.   Individual plaintiffs and Metro Ministry continue to sustain injury because of this discrimination and, consequently, have a right of action and strong likelihood of prevailing on their 13th Claim for violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* Based on the Fair Housing Act, therefore, the Court should amend its current Preliminary Injunction to enjoin defendants from vacating, demolishing or converting residential hotels until they adopt and begin implementation of valid replacement housing plans under 42 U.S.C. §5304(d) and California Health and Safety Code §§33413 and 33413.5.

### A.  The Fair Housing Act Provides Plaintiffs a Right of Action to Challenge Defendants' Failure to Comply with Federal and State Replacement Housing Requirements.

The Fair Housing Act provides that <u>any person aggrieved</u> by a violation of the Fair Housing Act may bring a civil action in an appropriate federal district court or state court.  42

-20-

1  U.S.C. §3613. Indeed, "[t]here is no question that the Fair Housing Act" creates individual rights

2  enforceable under 42 U.S.C. §1983. *Langlois v. Abington Housing Authority*, 234 F. Supp. 2d,

3  33, 55 (D. C. Mass. 2002).[15]

4  Section 3604(f)(1) of the Fair Housing Act provides that it is unlawful "to discriminate in

5  the sale or rental, *or to otherwise make unavailable or deny*" a dwelling to a person because of a

6  handicap of the person or any person associated with the person. (Emphasis added.) As the

7  Court previously determined, a disproportionate number of the residents who have been impacted

8  by Defendants' refusal to comply with their relocation and replacement housing obligations are

9  disabled. PI Order at 5. This includes individual plaintiffs Stanford Cobbs and Richard Price.

10  The Court also has found that the individual plaintiffs and Metro Ministry suffered injury due to

11  defendants' actions. PI Order at 7-10 & fn. 5. These findings were upheld by the Ninth Circuit

12  in *Price v. City of Stockton*, 390 F.3d at 1117. Plaintiffs therefore are aggrieved persons under

13  the Fair Housing Act.

14  Indeed, the right to bring suit under the Act is limited only by the Article III constitutional

15  requirement of injury in fact. *Havens Realty Corp. v. Coleman*, 455 U.S. 370, 372 (1982). The

16  *Havens* court found that Congress did not intend to restrict the class of plaintiffs who can sue

17  under the Act, relying on *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 102 (1979).

18  455 U.S. at 370. The *Gladstone* court noted that the "'rights granted by [the Act] . . . may be

19  enforced by civil actions . . . .'" *Gladstone* at 102-03. Because Congress did not specifically

20

21  [15] In finding no private right of action to enforce the anti-discrimination provisions of §109

22  of the HCDA, the court in *Latinos Unidos de Chelsea En Accion (LUCHA) v. Secretary of Hous. &
   Urban Dev.*, 799 F.2d 774 (1st Cir., 1986) nevertheless declared: "We thus suspect that Congress

23  expected that Titles VI and VIII [the Fair Housing Act] would provide the primary obligations with

24  regard to nondiscrimination, and that the main purpose of section 5309(a) was the practical one of
   specifying HUD's role, under the HCDA, in enforcing the requirement that federal fund recipients

25  not discriminate. We note, moreover, that denying a private right of action under HCDA's
   nondiscrimination provision does little to limit an individual's ability to challenge discriminatory

26  practices; as in this case, Titles VI and VIII may still be used to challenge any action of

27  discrimination by recipients of HCDA funds. *Id.* at 794 .

28

Amended Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Amend Preliminary Injunction

describe what types of plaintiffs may sue under the Act, the Court reasoned that "Congress *intended*" that any injured person could bring a cause of action under the Act. *Id.* at 103, n. 9 and at 104 (emphasis added). Accordingly, federal courts are not permitted to place prudential limitations on a plaintiff's ability to establish standing. *Havens*, 455 U.S. at 372. And organizations such as Metro Ministry, which has expended actual resources due to the illegal actions of defendants, have standing under the Fair Housing Act. *Inland Mediation Board v. City of Pomona*, 158 F. Supp. 2d 1120, 1135-37 (C.D. Cal. 2001).

**B.    Actions Having a Discriminatory Effect on Persons with Disabilities Violate the Fair Housing Act.**

In virtually every circuit, including the Ninth Circuit, courts have held that discriminatory effects on protected classes constitute illegal discrimination under Title VIII. *See Keith v. Volpe*, 858 F.2d 467, 482 (9th Cir. 1988), *cert. denied*, 493 U.S. 813 (1989); *Halet v. Wend Investment Co.*, 672 F.2d 1305, 1311 (9th Cir. 1982). Discriminatory effect is shown when an outwardly neutral policy or action produces a significantly adverse *or* disproportionate impact on a group of persons protected by the fair housing laws. *Gamble v. City of Escondido*, 104 F.3d. 300, 306-07 (9th Cir. 1996). "Effect, not motivation, is the touchstone because thoughtless housing practice can be as unfair to minority rights as a willful scheme." *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1976).[16]

The Ninth Circuit has held that proof of discriminatory effect by itself is sufficient to establish a prima facie case. *Pfaff v. Department of Hous. & Urban Dev.*, 88 F.3d 739, 745-46 (9th Cir. 1996)("we find no support for the proposition that a finding of intent is necessary to establish a prima facie case of disparate impact under the FHA") citing *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934-5 (2d Cir.), *aff'd* 488 U.S. 15 (1988) ("The Act's stated purpose to end discrimination requires a discriminatory effect standard; an intent

---

[16] Discriminatory effect means that "the conduct of the defendant(s) actually or predictably results in racial discrimination." *United States v. City of Black Jack*, 508 F.2d 1179, 1184 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042 (1975). *See also Resident Advisory Board v. Rizzo*, 564 F.2d 126, 146-48 (3d Cir. 1977), *cert. denied sub nom, Whitman Area Improvement Council v. Resident Advisory Board*, 435 U.S. 908 (1978).

1   standard would strip the statute of all impact on de facto segregation.") and *United States v. City*

2   *of Black Jack*, 508 F.2d at 1184-85.  Here, plaintiffs demonstrate that defendants' failure to take

3   actions to plan for housing to replace the hotels scheduled for demolition and removal has an

4   adverse and disparate impact on persons with disabilities.[17]

5   **C.    Defendants' Actions Have a Discriminatory Effect on Disabled Persons**.

6       Under the Fair Housing Act, there are two types of discriminatory effect.  *Metropolitan*

7   *Hous. Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); *Keith v.*

8   *Volpe*, 618 F. Supp. 1132, 1150-51 (C.D. Cal. 1985).  First, a plaintiff may demonstrate

9   discriminatory effect by showing that the neutral decision had a greater *adverse impact* on one

10  protected class as compared to others not in the protected class.  *See id.*  Second, a plaintiff may

11  demonstrate *ultimate discriminatory effect* by demonstrating "the effect which the decision had

12  on the community involved; if it perpetuates segregation and thereby prevents * * * association

13  [with the protected class] it will be considered invidious under the Fair Housing Act

14  independently of the extent to which it produces a disparate impact" on a protected group.  *Keith*,

15  618 F.Supp. at 1150-51, quoting *Arlington Heights*.[18]    Either type of discrimination gives rise to

16  a violation of the Fair Housing Act.  *See Keith v. Volpe*, 858 F.2d 467 at 484.

17      Plaintiffs in this action can establish both adverse and ultimate effect discrimination.

18      **1.    Defendants' Illegal Conduct Has Adverse Impact.**

19          **a.    Defendants' Failure To Comply With Their Replacement
                    Housing Obligations Has A Statistically Significant Effect.**

20      In assessing adverse impact on racial or ethnic minorities, it is enough that a defendant's

21  policy "had a disproportionate effect on the minority families evicted" regardless of any overall

22  racial impact on the surrounding community as a whole.  *Betsey v. Turtle Creek Associates*, 736

23

---

24      [17] Title VIII does not require that the effect of the challenged action be *solely* upon a protected
25  class.  *Metropolitan Hous. Dev. Corp.*, 558 F.2d at 1291.

26      [18] As the Supreme Court has recognized, conduct that has the necessary and foreseeable
27  consequence of perpetuating discrimination can be a deleterious as purposeful discrimination in
    frustrating the national goals behind the Fair Housing Act. *Trafficante v. Metropolitan Life Ins. Co.*,
28  409 U.S. 205, 211 (1972).

-23-

F.2d 983, 987 (4th Cir. 1984). The analysis is the same for the class protected here. The exact magnitude of the disparate impact may be subject to dispute in this litigation, but it is clear that a very large and disproportionate percentage of the displaced residents are disabled. Logan Dec., Ex. 1 at 4-8. And displaced persons have priority for any production or replacement housing units. HSC §33411.3. Of those households displaced by Defendants' actions, therefore, disabled households suffer disproportionately.

In *Keith*, the City of Hawthorne refused to approve the development of replacement housing for the low income residents displaced by the construction of a freeway. 618 F.Supp. at 1148-49. A prima facie showing of adverse impact was present because a majority of the displaced low income residents were black and Latino. Here, approximately 19% of the displaced downtown hotel residents are disabled and 17.3% of those reported on the City's Relocation Assistance Log of displaced tenants receive disability income in the form of SSI. Choi Dec. ¶4, Ex. 2 at 115-16; Logan Dec., Ex. 1 at. 6-7 and Table 3. While not a majority, this compares to 9.4% of households citywide that receive SSI. The percentage of disabled households among those displaced, therefore, is nearly *double* the citywide percentage of disabled households. *Id.*, at 6. As Professor Logan concluded, there is a significantly disproportionate impact on persons with disabilities. *Id.* at 5.

### b. Other Factors Underscore the Severity of the Adverse Impact of Defendants' Illegal Conduct.

Plaintiffs also would prevail under the stricter method of establishing disparate impact used by some other circuits. As explained in *Keith*, plaintiffs in those circuits must show two of four factors, one of which is discriminatory effect. *Keith*, 858 F.2d at 483, citing *Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights*, 558 F.2d at 1290. The four factors are:

> (1) the strength of the plaintiff's showing of discriminatory effect, (2) whether there was some evidence of discriminatory intent, (3) what the defendant's interest was in taking the action complained of, and (4) whether the plaintiff sought to compel the defendant affirmatively to provide housing for minorities or merely to restrain defendant . . .

*Id.*

Plaintiffs here not only demonstrate discriminatory effect, but also provide significant

-24-

evidence under at least two other factors. Regarding intent (factor two), defendants clearly knew

that there was a strong likelihood based on their prior experience in displacing lower income

residents that many of the residents of the downtown hotels are in protected classes. *See, e.g.,*

Haffner 2002 Dec., ¶26, Ex. 24. Plaintiffs' counsel also alerted defendants to the nature of the

population that would be adversely affected by defendants' aggressive code enforcement

strategies as early as June 2002. *Id.*, ¶23, Ex. 21G. In fact, defendants contacted the County

mental health agency and requested that mental health staff attend hotel closings. Choi Dec.¶4,

Ex. 2 at 112-13. The foreseeable consequences of discriminatory effect are relevant to the

inquiry of intent. *Columbus Board of Education v. Penick*, 443 US. 449, 464-65 (1979), *Diaz v.*

*San Jose Unified School District* 733 F.2d. 660, 662-62 (9th Cir. 1984), *cert. denied*, 471 U.S.

1065 (1985).

There also have been procedural irregularities and substantive law violations which are

probative of intent. *Village of Arlington Heights v. Metropolitan Housing Development*

*Corporation* 429 U.S. 252, 266 (1977). For example, defendants misrepresented to HUD and

plaintiffs' counsel that CDBG funds had not been used in the code enforcement efforts.[19]

Defendants have also violated substantive laws in their failure to prepare relocation and

replacement plans as required under federal and state laws. *See* PI Order at 33. Most tellingly,

defendants' use of code enforcement to close the residential hotels was not designed to protect

the health and safety of hotel residents. For decades, the defendants inspected the hotels and

issued permits to operate and certificates of occupancy despite their state of deterioration. *See* PI

Order at 23-25; Haffner 2002 Dec. ¶ 19, Ex. 17. Defendants prevented hotel owners from

complying with code enforcement orders by issuing and then canceling building permits

necessary to complete required repairs. *See* Haffner 2002 Dec. ¶¶ 11, Ex. 9R; 12, 13, Ex. 10, 11.

---

[19] Defendants informed HUD and plaintiffs' counsel that no CDBG money was involved in
the code enforcement efforts. Haffner 2002 Dec., ¶23, Exs. 21C, 21D. In fact, the City's budget
makes clear that it spent more than $1.1 million of CDBG money in code enforcement including
"concentrated code enforcement on the downtown hotels and motels." *Id.* at ¶21, Exs. 19B, 19C,
19D; ¶22, Ex. 20.

1    The defendants also prevented the re-occupancy of the vacated SRO hotels by requiring them to

2    meet current building code standards for new construction before an occupancy certificate would

3    be issued. *See* Declaration of Salim Khan in Support of Temporary Restraining Order and

4    Preliminary Injunction, filed February 26, 2002 at 3:26-5:5; ¶7:19-21.

5           With respect to the third factor (defendants' interest), a governmental body abusing its

6    power by acting illegally, acts without legitimate interest. *Metropolitan Housing Development*

7    *Corp.*, 558 F.2d at 1293.   Plaintiffs have established the illegality of defendants' failure to plan

8    for replacement housing, and, therefore, defendants' interest is not entitled to the  deference

9    normally afforded to legitimate government action. *Id.*

10          Finally, regarding factor four, plaintiffs seek merely to enjoin defendants from proceeding

11   until they comply with the law by adopting adequate replacement housing plans.  They do not

12   seek to compel defendants to affirmatively provide housing.  Accordingly, plaintiffs could

13   prevail under the stricter Title VIII test because, in addition to discriminatory effect, they can

14   show strong evidence of intent, illegal conduct by defendants and do not seek affirmative

15   injunctive relief.

16           **2.      Defendants' Conduct Has The Ultimate Effect Of Furthering**
                       **Segregation of Disabled Persons In The Stockton Area.**

17           The district court in *Keith v. Volpe* found a city's refusal to grant zoning permits to two

18   developers to develop replacement housing for persons displaced by a freeway had a

19   discriminatory effect in violation of the Fair Housing Act, and that the ultimate effect of

20   frustrating the developments was to prevent low-income minority displacees from continuing to

21   reside in the city.  618 F. Supp. at 1151.  The court noted that the census tracts from which

22   persons were being displaced had a higher percentage of minority residents than other census

23   tracts in the city.  *Id.*  The court also found that there was a larger percentage of minority than

24   white residents below the poverty line and that increases in housing costs made it difficult for

25   lower income households to compete for affordable housing in the city.  *Id.*   The court

26   concluded that if the replacement housing was not built, the city would have succeeded in

27   depopulating itself of a large number of its minority residents.  *Id.*

28

-26-

1  Just as plaintiffs in *Keith* established ultimate effect discrimination, plaintiffs in this case

2  can establish that defendants' failure to plan for replacement housing will result in

3  disproportionate departure of low income disabled households from Stockton. The census tract

4  affected by the city's closure of residential hotels had a higher percentage of people with

5  disabilities compared with the rest of the City of Stockton.[20] Furthermore, people with

6  disabilities comprise a higher percentage of extremely low income and low income persons in the

7  City of Stockton who would be eligible for the replacement housing.[21]

8  Under California law, as previously explained, the displaced tenants must be given

9  priority for occupancy of the replacement units.  HSC §33411.3.  Therefore, because the

10  displaced tenants are disproportionately comprised of disabled persons, the failure of defendants

11  to fulfill their replacement housing obligations will have a greater impact on persons with

12  disabilities than on other households in Stockton that are eligible for the replacement housing.

13  Logan Dec., Ex. 1 at 7-8.  Without adequate replacement housing within Stockton, these

14  households will be forced to look for affordable housing outside of Stockton.  Indeed, the Mayor

15  and City staff intended as much.  The Mayor encouraged the staff involved in the City's minimal

16  relocation efforts to find people housing in Bakersfield and Fresno, and staff asked if people

17  helping with relocation to ask tenants if they wanted to move out of Stockton.   Choi Dec. Ex. 2

18  at 37-41.

19  Defendants' avoidance of their duty to plan for replacement housing will also result in a

20  disparate impact on disabled households from outside the downtown area.   Of the households

21  eligible to apply for replacement housing living outside of downtown Stockton, a

22  disproportionate share include persons with disabilities.  HSC §33413(a) provides that

23

24  [20]  The percentage of persons with disabilities as measured by persons receiving SSI is 23%
25  compared to only 9.4% citywide. *See* Logan Dec, Ex. 1 at 4. 30.6% of residents in the census tract
   report a disability compared with 22.5% citywide. *Id.*

26  [21]  39.4% of extremely low income persons in the City of Stockton identify themselves as
27  having disabilities, 37.3% for low income persons and only 23.4% among persons with higher
   incomes.  Logan Report at 8.  15.6% of extremely low income persons receive SSI or Social
28  Security, 13.9% for lower income persons and only 5.3% of higher income persons. *Id.*

-27-

1   replacement housing must be available and affordable to households of the same income as those

2   displaced.  Therefore, because the displacees are predominantly persons with fixed income from

3   General Relief, SSI or Social Security (Logan Dec., Ex. 1 at 4-6 ), the replacement housing must

4   be affordable to people of this income level.  Using a statistically significant weighted sample of

5   the 2000 Census data, Professor Logan found that whereas 27.3% of adult Stockton residents

6   reported a disability, 39.4% of these disabled residents had extremely low incomes (less than

7   30% of median).  *Id.* at p. 8.[22]  Consequently, of the households forced to look beyond Stockton

8   for affordable housing, a disparate share include disabled persons, which will only increase the

9   segregation of disabled persons from the greater community in Stockton.

10          The statistical data showing a discriminatory effect is supported by anecdotal evidence of

11  the effect of the displacement on residents of the residential hotels.  Many of the displaced

12  residents were shipped out of town to a migrant workers camp and many became homeless.

13  Haffner 2002 Dec. ¶ 27, Ex. 25.  Thus, the ultimate effect of closing down the residential hotels

14  and failing to plan replacement housing is to prevent low income persons with disabilities from

15  residing in the City of Stockton.

16          **D.      No Compelling Governmental Interest Can Justify Defendants' Illegal
                      Conduct.**

17          Once a plaintiff has shown a discriminatory effect, the burden shifts to a governmental

18  defendant to demonstrate "that its conduct was necessary to promote a compelling governmental

19  interest."  *United States v. City of Black Jack*, 508 F.2d at 1185; *accord, Betsey v. Turtle Creek*

20  *Associates*, 736 F.2d at 988-89.  In the instant case,  Defendants' actions violate federal and state

21  laws.  Consequently, by definition there is no governmental interest, compelling or otherwise,

22  that can license Defendants' to break the law.  *Metropolitan Housing Development*, 558 F.2d

23

24

---

25          [22] Professor Logan also determined that other indicators of disability establish that of those
26  households income-eligible for the replacement housing, a significantly disproportionate number are
    disabled persons: 19.3% of extremely low income households receive SSI, as compared to 14.6%
27  of all households; 15.6% of extremely low income households under 65 receive SSI or SSI as
    compared to 7.6% of all households– *three times* the level of 5.3% for households with incomes
28  above 70% of median.  *Id.*

1283 at 1293.

### III.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF THEIR STATE FAIR HOUSING LAW CLAIM.

Plaintiffs are also likely to succeed on their parallel state fair housing claim (14th Claim). Like the Fair Housing Act, the California Fair Employment and Housing Act (FEHA) ( Cal. Govt. Code §§ 12900 *et seq.*) prohibits discrimination against persons with disabilities, and violation of FEHA may be established by a showing of discriminatory effect.   Plaintiffs can therefore establish disability discrimination under FEHA on the same analysis used in their federal claim.   FEHA also prohibits discrimination based on *source of income*, and plaintiffs will prevail on this aspect of its FEHA claim as well, by showing that defendants' refusal to adequately plan for replacement housing has a discriminatory effect on persons receiving income from county General Relief or SSI.   As with the Fair Housing Act claim, given that the discriminatory effects result from defendants' violation of state and federal replacement housing laws, under FEHA defendants cannot establish any compelling purpose to legitimize the discriminatory effects.

#### A.   The Court May Grant Plaintiffs A Preliminary Injunction Under FEHA To Prevent Discrimination Based on Disability or Source of Income.

Comparable to the Fair Housing Act, FEHA provides that any "aggrieved person" may bring a civil action to redress a discriminatory housing practice.  Cal. Govt Code §129589.1. FEHA protections are at least as broad and may afford no fewer rights and remedies as the federal Fair Housing Act.  Cal. Govt. Code § 12955.6;  *Llanos v. Estate of Coehlo,* 24 F.Supp.2d 1052, 1059 n.6 (E.D. Cal. 1998) *citing Brown v. Smith*, 55 Cal. App. 4th 767, 780 (1997) (FEHA, in the housing area "is intended to conform to the general requirements of federal law in the area and may provide greater protection against discrimination.").

§12955 of FEHA declares that it is illegal:

(k) To otherwise make unavailable or deny a dwelling based on discrimination because of.... source of income, [or] disability....

(l) To discriminate through public or private land use practices, decisions, and authorizations because of ...disability,...[or] source of income...

FEHA thus conforms to the Fair Housing Act's protection of persons with disabilities and adds

-29-

1  (among other classes) a prohibition against discrimination based on source of income.   FEHA

2  also expressly authorizes the court to grant a preliminary injunction to prevent continuing

3  unlawful practice. Cal. Govt. Code § 12989.2.

4  **B.    Defendants' Actions Have a Discriminatory Effect Under FEHA on Disabled Persons.**

5      A violation of the FEHA can be established by demonstrating that the challenged conduct

6  has a discriminatory effect on a protected class. Cal. Govt. Code § 12955.8.[23]  While there are no

7  California decisions addressing §12955.8, California courts look to federal decisions construing

8  federal anti-discrimination laws for guidance. *Walker v. City of Lakewood,* 272 F.3d 1114, 1125-

9  26 (9th Cir. 2001).[24]  Accordingly, because plaintiffs establish a violation of the federal Fair

10  Housing Act prohibition of disability discrimination, they also establish a violation of FEHA's

11  protections of persons with disabilities.

12  **C.    Defendants' Actions Have a Discriminatory Effect Under FEHA on Persons**

13  **with Income from General Relief and on Persons with Income from SSI.**

14      Plaintiffs in addition will prevail in showing that defendants' acts discriminated against

15  persons based on source of income– both county General Relief and SSI. As shown in the Fair

16  Housing Act discussion of the disparate impact on persons with disabilities, many of the

17  residents of the hotels were on SSI. Even more were receiving General Relief. These tenants

18  and other residents in the city who would be eligible to reside in any replacement housing are

19  disproportionately persons on General Relief/welfare or SSI as compared to the city residents on

20  the whole. In light of this and because the displaced residents have priority for occupancy in any

21  units developed to replace the hotels (*see* HSC §33411.3 discussed *supra*), the failure of

22  defendants to plan for replacement housing will have a discriminatory effect on households based

23  

24  [23] "[V]iolation of FEHA…may be proved by establishing….[that] an act or failure to act has

25  the *effect*, regardless of intent, of unlawful discrimination (discriminatory effect)." *Broadmoor San Clemente Homeowners Assn. v. Nelson*, 25 Cal.App.4th 1, 7 (1994).

26  [24] Moreover, the federal courts have held that other California statutes prohibiting housing

27  discrimination "require proof only of discriminatory effect" on a protected class. *Keith v. Volpe*, 618 F.Supp. at 1158, *aff'd*, 858 F.2d at 485, both cases holding that by proving a claim under the Fair

28  Housing Act, plaintiffs also establish a violation of Cal. Govt. Code § 65008(b).

on source of income– an effect of which, it turns out, defendants were well aware.

## 1.    General Relief.

When subjected to the discriminatory effect analysis employed above to establish disability discrimination, defendants' conduct is shown to produce a statistically significant discriminatory effect on persons receiving General Relief.  Furthermore, other factors, including evidence of intentional discrimination against General Relief recipients and the illegitimacy of defendants' actions, establish illegal disparate impact under the effects test articulated in *Keith v. Volpe, supra,* 858 F.2d at 483.

### a.    There is Compelling Evidence of Discriminatory Effect.

As explained in plaintiffs' opening brief in support of their initial motion for preliminary injunction, defendants actually *counted* the number of General Relief recipients who lived in the hotels that closed, at the same time that they counted the numbers of parolees and "290's." Haffner 2002 Dec. ¶11, Ex. 9D at COS00762, 9H at COS01709, 9J at COS01813, 9P at COS03615; *see also* Choi Dec. ¶3, Ex. 1.  Professor Logan tabulated the information contained in Defendants' relocation assistance log and concluded that of the 353 displaced persons on the list, 147, or 46.8%, depended on General Relief.  Logan Dec., Ex. 1 at 6.  This compares with the overall General Relief recipient rate of less than 0.5% for the City of Stockton as a whole. Professor Logan also combined the totals of displaced tenants on General Relief and those on AFDC to indicate the number of persons who received welfare in some form.  This demonstrated that out of the 353 persons, 179, or 49%, depended on some form of welfare.  Logan Decl. at 6-7, Table 3.[25]  It is strong evidence of disparate impact on persons on General Relief and other welfare assistance– sufficient by itself to demonstrate unlawful discriminatory effect.  *See Betsey v. Turtle Creek Associates,* 736 F.2d at 987.    And it is corroborated by other findings in Professor Logan's report.

Professor Logan examined Census 2000 data for the Census tract containing the hotels and found that 15.1% of the households reported receiving some form of "public assistance" as

---

[25] 55.1% of persons with a known source of income.  Logan Decl., Exh. 1. at 6.

Amended Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Amend Preliminary Injunction

1    compared to 10.5% of Stockton residents citywide. *Id.* at pp. 4-5. He also reviewed the list of

2    persons receiving General Relief prepared by San Joaquin County by block and zip code and

3    determined that the neighborhood blocks on which the hotels were located suffered a

4    "precipitous decline in General Relief population" at the time the hotels were closed– a decline

5    that was not experienced citywide.    Between July 2001 and June 2003 the number of General

6    Relief recipients in the zip code of the hotels (95202) dropped by 132 persons, while the number

7    of General Relief recipients "in the rest of Stockton (including zip codes extending beyond city

8    limits) was almost unchanged." *Id.*, at 5-6. The decline was almost the same as the 139 person

9    decline of General Relief recipients in the four block area most affected by CHAT code

10   enforcement. *Id.*

11       Census 2000 also provided Professor Logan with data from which he developed a

12   weighted sample that shows that Stockton residents receiving public assistance *outside* the

13   downtown area are also disproportionately effected by defendants failure to plan for housing to

14   replace the closed hotels. *Id.* at 7-8, Table 4. As already pointed out, replacement housing must

15   be affordable and available at the income level of those persons displaced,[26] and in this regard,

16   many of the displaced are households with General Relief public assistance– an income of well

17   under 30% of median ($10,636). *Id.* Professor Logan found that 14.7% of Stockton residents

18   with incomes under 30% of median are on public assistance as compared to 5.3% of all Stockton

19   residents. *Id.* Therefore, of the households in Stockton that would be eligible for the

20   replacement housing, a disparate percentage– almost *three* times that of the general population–

21   are public assistance recipients.

22                          **b.    Evidence that Defendants Intended to Displace General Relief**
                                    **Recipients**.

23       Defendants' awareness of the suffering that their conduct would inflict on persons on

24   General Relief is beyond dispute. Defendants' staff repeatedly described the hotels to County

25   staff as "GR hotels." Choi Dec. ¶4, Ex. 2 at 124-25. Defendants' staff told County staff prior to

26

27

28       [26] *See* HSC §33413.5, discussed in the Fair Housing Act section of this brief.

-32-

1   closure of the hotels that a substantial number of the tenants were General Relief recipients, and

2   they asked the County to assist with the closures because they believed the County would be

3   responsible for any General Relief tenant displaced through defendants' code enforcement.  *Id.*

4   The longer defendants go without preparing comprehensive replacement housing plans, the

5   longer the suffering and homelessness created by their displacing activities will endure and the

6   more likely it is that these households will be forced out of Stockton.

7        The Mayor and City staff, as shown previously, seemed to intend this result.  They

8   encouraged staff to find people housing outside of Stockton and to ask tenants if they wanted to

9   leave town.   Choi Dec. ¶4, Ex. 2 at 37-41.

10              **c.**     **Defendants' Conduct Has The Ultimate Effect Of Furthering**
11                      **Segregation of General Relief Recipients In The Stockton Area.**

12        Just as plaintiffs have established ultimate effect discrimination by demonstrating that the

13   failure of Stockton to plan for replacement housing would result in the disproportionate departure

14   of disabled households from the city, plaintiffs can show that defendants' nonfeasance has and

15   will have a similar segregative effect on persons on General Relief.

16        San Joaquin County Human Services Agency General Relief Coordinator Sharon Herrera

17   testified that while prior to the hotel closings General Relief recipients had no problem finding

18   housing, by the time of her deposition hundreds were homeless.  Choi Dec. ¶4, Ex. 2 at 119.  Ms.

19   Herrera's deposition was taken on February 11, 2003, and she testified, at that time, that 220 to

20   250 GR recipients per month had no fixed and permanent address.  *Id.* at 118-120.  When asked

21   by Defendants' counsel what caused this increase in homelessness, Ms. Herrera responded:

22               Prior to the closure of the hotels, we did not have anyone on general relief that
                was homeless because they might be homeless when they applied, but we would
23              give them a list of hotels that we knew accepted general relief.  And by the time
                they came in for their interview the next day, they would have secured a room
24              somewhere, housing.  Since the closure of those, all those hotels, it's depleted
                their – the available housing, and I mainly attribute it to that.

25   *Id.* at 294.

26          **2.**     **Supplemental Security Income (SSI).**

27        Plaintiffs have already established in their analysis of the effect of defendants' conduct on

28

-33-

1  persons with disabilities that SSI recipients also bear the adverse impacts of the failure to plan for

2  replacement housing disproportionately to the general population.

3          When SSI, General Relief, AFDC and SSI recipients are considered together, nearly three

4  quarters of the displaced residents received some type of public benefits.  *See* Logan Dec, Ex. 1

5  at 7.  Because three quarters of the displacees receive public benefits, failure to plan for the

6  replacement housing impacts displacees on public benefits three times as hard as it impacts

7  displacees not on public benefits.  This showing alone is sufficient to establish a disparate impact

8  based on source of income.  *See Keith v. Volpe*, 618 F. Supp. at 1150.

9          **D.      Defendants Cannot Rebut Plaintiffs' Evidence of Disproportionate Effect.**

10         FEHA provides that once plaintiffs demonstrate a discriminatory effect, an action or inaction

11 is not an unlawful housing practice if the defendant:

12             can establish that the action or inaction is necessary to achieve an important purpose
               sufficiently compelling to override the discriminatory effect and effectively carries
13             out the discriminatory effect.

14 Cal. Govt Code §12955.8(b).  In deciding this question the Court must consider "whether or not

15 there are feasible alternatives that would equally well or better accomplish the purpose advanced

16 with a less discriminatory effect." §12955.8(b)(1).  Here, defendants' inaction of failing to prepare

17 the replacement housing plans required by state and federal law is illegal and, therefore, legally

18 antithetical to, rather than necessary to, any legitimate purpose.   *See   Metropolitan Housing*

19 *Development Corp. et al., v. Village of Arlington Heights*, 558 F.2d 1283 at 1293.

20         Accordingly, the plaintiffs have demonstrated that they are substantially likely to prevail on

21 the merits of their FEHA claim.

22 **IV.    PLAINTIFFS WILL CONTINUE TO SUFFER IRREPARABLE INJURY UNLESS
           DEFENDANTS ARE RESTRAINED BY THIS COURT; THE BALANCE OF
23         HARDSHIP TIPS DECIDEDLY IN THEIR FAVOR.**

24         **A.      The Court Holds Broad Power to Grant the Preliminary Relief Necessary to
                     Prevent Further Irreparable Harm from Defendants' Discriminatory Acts.**

25

26         This Court and the Ninth Circuit have already found that under the facts of this case the Court

27 has broad powers to fashion the preliminary relief necessary to ensure that defendants refrain from

28 further violations of the relocation assistance provisions of §104(d) and (k) of the HCDA and do no

-34-

1   further harm to plaintiffs and others. PI Order at 34-35; *Price*, 390 F.3d at 1117-18.

2       The Court's powers under the fair housing laws are at least as extensive.   Private Fair

3   Housing Act litigants "act not only on their own behalf but also 'as private attorneys general in

4   vindicating a policy that Congress considered to be of the highest priority.'" *Trafficante v.*

5   *Metropolitan Life Insurance Co.*, 409 U.S. at 209, 211 (1972); *see generally Park View Heights v.*

6   *City of Black Jack,* 605 F.2d 1033 (8th Cir 1979), *cert denied*, 445 U.S. 905 (1980).

7       When discrimination occurs, the court possesses

8           not only the power but the duty to render a decree which will so far as possible
            eliminate the discriminatory effects of the past as well as bar like discrimination in
9           the future.

10  *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975), *quoting Louisiana v. United States*, 380

11  U.S. 145, 154 (1965).  The duty applies in housing discrimination cases.  "[A] district court has the

12  broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs. *Atkins*

13  *v. Robinson,* 545 F.Supp. 852, 889 (E.D. Va 1982), *affd*, 733 F.2d 318 (4th Cir. 1984). "Injunctive

14  relief should be structured to achieve the twin goals of insuring that the [Fair Housing] Act is not

15  violated in the future and removing any lingering effects of past discrimination." *Marable v. Walker*,

16  704 F.2d 1219, 1221 (11th Cir. 1983).

17      The breadth of this duty extends to preliminary injunctive relief.   For example, the district

18  court in *Zuch v. Hussey*, 394 F. Supp. 1028 (E.D.Mich.1975) issued a preliminary injunction

19  prohibiting defendant's steering and blockbusting practices *and* requiring implementation of an

20  affirmative program of marketing, education and objective, nondiscriminatory client standards. *Id.*

21  at 1055-59. *See also Angell v. Zinsser*, 473 F.Supp. 488, 501-02 (D. Conn. 1979) (enjoining local

22  officials from withdrawing an application for HUD funds that required recipients to affirmatively

23  further fair housing), and  *Brown v. Artery Organization, Inc.*, 654 F.Supp. 1106, 1120 (D.D.C.

24  1987) (compelling apartment owners to notify tenants of the preliminary injunction prohibiting

25  evictions).

26      In addition, the standard requirements for equitable relief "need not be satisfied when an

27  injunction is sought to prevent the violation of a federal statute which specifically provides for

28  injunctive relief." *Burlington Northern Ry. Co. v. Department of Revenue*, 934 F.2d 1064, 1074-75

-35-

(9th Cir. 1991) *citing Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983). Instead, a court has discretion to enter a preliminary injunction where the trial court finds reasonable cause to believe that a violation of the statute has occurred or is about to occur. *Burlington Northern Ry. Co.*, 697 F.2d at 869.   In such circumstances, a showing of irreparable harm is not required. *Id.*

This standard governs plaintiffs' claims under the Fair Housing Act because the Act specifically authorizes preliminary injunctive relief.   Section 3613(c)(1) provides that in a civil action "if the court finds that a discriminatory housing practice has occurred or is about to occur, the court * * * may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such a practice * * * as may be appropriate)." 42 U.S.C. § 3613(c)(1).   A preliminary injunction may be issued if a reasonable probability of a violation of the Fair Housing Act has been established.        The mere fact of discrimination engenders irreparable damage, citing *Vietnamese Fishermen's Association v. Knights of the Ku Klux Klan*, 543 F. Supp. 198 (S.D.Tex.1982) ("Victims of discrimination suffer irreparable injury, regardless of pecuniary damage."). *Gresham v. Windrush Partners, Ltd*, 730 F.2d 1417, 1424 (11th Cir. 1984).

Among other things, the court observed:

> [a] person who is discriminated against in the search for housing cannot remain in limbo while a court resolves the matter.  He or she must find housing elsewhere, and once that housing is found, even if in a segregated neighborhood, it becomes difficult to disrupt new friendships and other community ties by uprooting oneself again.

*Id.* Thus the harm encompasses the loss of opportunity to live in replacement housing that is safe, sanitary, decent and integrated and that is accessible to jobs; and the attendant loss of opportunity "'to escape the never-ending and seemingly unbreakable cycle of poverty.'" *Id.*, quoting *Banks v. Perk*, 341 F. Supp. 1175, 1185 (N.D.Ohio 1972), *aff'd in part and rev'd in part*, 473 F.2d 910 (6th Cir.1973).   And, akin to the irreparable damage of illegal "steering" and "blockbusting" by real estate agents, displacement combined with lack of replacement housing steers the displaced tenants from their neighborhood blocks, right out of town. *See Gresham,* 730 F.2d at 1424, citing *Zuch v. Hussey*, 394 F. Supp. 1028, 1052 (E.D.Mich.1975).

-36-

1    While in the instant case, unfortunately, much displacement has occurred already, the failure

2 to timely prepare and implement replacement housing plans will only further delay the development

3 of replacement housing and consequently increase the likelihood that those displaced will languish

4 in substandard or unaffordable housing or be forced from the city before they can enjoy the

5 opportunity to move into replacement units. *See* Logan Decl., Exh. 1, pp. 7-8 where Professor Logan

6 demonstrates that Stockton residents who are disabled or who receive public assistance are

7 disproportionately affected by delay in the development of replacement housing.

8    The plaintiffs, as shown above, can establish at the very least a reasonable probability of a

9 violation of the Community Redevelopment Law and state and federal Fair Housing statutes.

10    **B.    The Balance of Hardships Tips Sharply in Plaintiffs' Favor**

11    As this Court previously found, Defendants' failure to comply with their relocation asistance

12 and replacement housing obligations "works a profound hardship" on Plaintiffs. PI Order at 34. As

13 set forth in the Declarations of Mr. Henderson and Mr. Cobbs, Defendants' failure to comply with

14 their statutory obligations have resulted in a series of moves and bouts of homelessness for Mr.

15 Henderson. Henderson 2005 Dec. ¶5; *see also* Cobbs 2005 Dec. ¶5. The destruction of additional

16 units of low income housing units without an adequate plan for replacement or reasonable and timely

17 steps to ensure that Plaintiffs will receive the benefit of a priority for any newly developed units

18 continues to threaten plaintiffs with recurring and protracted homelessness. These hardships

19 outweigh any hardship defendants may suffer. Defendants would be required to refrain from

20 converting and demolishing buildings and for only so long as it takes to develop and implement a

21 valid replacement housing plan. *See* PI Order at 34-35; *Price*, 390 F.3d at 1117.

22    **V.    NO ADDITIONAL BOND SHOULD BE REQUIRED OF PLAINTIFFS.**

23    Pursuant to Fed. Rule of Civil Proc., Rule 65(c), this Court imposed a $1 bond which

24 plaintiffs posted after issuance of the Preliminary Injunction. *See* PI Order at 35-36. An additional

25 bond should not be imposed. A district court should not require bond, or should impose mere

26 nominal security, when to do otherwise would effectively deny indigent plaintiffs access to the

27 courts, especially when the likelihood of success on the merits is great. *California ex rel. Van de*

28

-37-

*Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1324-26, <u>modified</u> 775 F.2d 988 (9th Cir. 1985).  Both factors were present in this case when the PI Order issued and are present now. Plaintiffs remain indigent, and Metro Ministry (now known as Interfaith Council) is a non-profit organization.  If required to post a substantial bond, it would undermine Plaintiffs' ability to privately enforce the law.

Moreover, it is likely that plaintiffs will ultimately prevail on the merits, and granting an injunction would be in the public interest.  Both factors, as well as the plaintiffs' lack of resources, warrant that the preliminary injunction be amended without a requirement for plaintiffs to post an additional bond.

## **CONCLUSION**

For all of the foregoing reasons, plaintiffs respectfully request that the Court amend the preliminary injunction ordering the relief requested in the accompanying notice of motion.

DATED: February 22, 2005

Respectfully submitted,
CALIFORNIA RURAL LEGAL ASSISTANCE

CALIFORNIA AFFORDABLE HOUSING LAW PROJECT

WESTERN CENTER ON LAW & POVERTY

D. SCOTT CHANG

BY: /s/ Deborah Collins
     Deborah Collins

BY: /s/ Michael Rawson (as authorized on 2/22/05
     Michael Rawson

BY: /s/ Jack Daniel (as authorized on 2/22/05)
     Jack Daniel

-38-

1                                **PROOF OF SERVICE**

2            I, the undersigned, declare as follows:

3            I am a citizen of the United States and employed in the County of San Joaquin; I am over
the age of eighteen years and not a party to the within entitled action; my business address is
4  California Rural Legal Assistance, 242 N. Sutter St., Ste. 411, Stockton, California 95202.

5            On February 22, 2005 I served the within:

6  AMENDED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION TO AMEND PRELIMINARY INJUNCTION
7

8  on the parties in this action, by placing a true copy thereof in a sealed envelope(s), each envelope

9  addressed as follows:

10

11          Richard E. Nosky, Jr.
            Michael T. Rishwain
            Lori Whitaker
12         OFFICE OF THE CITY ATTORNEY
            City Hall, Second Floor
13         425 North El Dorado Street
            Stockton, CA 95202
14

15  ( )    (By First Class Mail) I caused each such envelope, with postage thereon fully prepaid, to
            be placed in the United States mail to be mailed by First Class mail at Stockton,
            California.
16

17  (X )   (By Personal Delivery) I caused each such envelope to be personally delivered to the
            persons and at the addresses set forth above on February 22, 2005

18  ( )    (By Messenger) I caused each such envelope to be delivered by messenger to the office of
            each addressee above.
19

20  ( )    (By Federal Express) I caused each such envelope to be sent by Federal Express to the
            offices of each addressee above.

21            I declare under penalty of perjury under the laws of the United States that the foregoing is
true and correct.  Executed on February 22, 2005, at Stockton, California.
22

23                                  /s/ Pilar P. Trevino
                                 Pilar P. Trevino

24

25

26

27

28