1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

RICHARD PRICE, et al.,

11                                          NO. CIV. S-02-65 LKK/KJM

          Plaintiffs,

12

     v.

13                                          O R D E R

CITY OF STOCKTON, CALIFORNIA,

14   et al.,

15          Defendants.

_____/

16

17   _____This action arises out of the City of Stockton's aggressive

18   enforcement of the City's housing codes which seeks to acquire

19   downtown single-room occupancy hotels (SROs), which house low

20   income and very low income persons.  Plaintiffs are, <u>inter alia</u>,

21   low income individuals who were evicted from the SROs in downtown

22   Stockton.  They brought this action seeking an injunction, alleging

23   that defendants are violating duties arising under the Housing and

24   Community Development Act, 42 U.S.C. §§ 5301 <u>et seq.</u>, the Uniform

25   Relocation  Act,  42  U.S.C.  §  4601,  the  California  Community

26   Redevelopment Law, Cal. Health & Safety Code §§ 33000 <u>et seq.</u>, and

1

1 the California Relocation Assistance Act, Cal Gov't Code §§ 7260
2 et seq.

3     On May 2, 2002, the court granted a preliminary injunction in
4 plaintiffs' favor.  This matter now comes before the court on
5 plaintiffs' motion to amend that preliminary injunction.  I decide
6 the motion based on the papers and pleadings filed herein and after
7 oral argument.

8                                  **I.**

9                          **FACTUAL BACKGROUND**

10     In 1961, the City of Stockton and its Redevelopment Agency
11 adopted the West End Urban Renewal Project Development Plan
12 ("West End Redevelopment Plan") to redevelop downtown Stockton.
13 Preliminary Injunction Order ("PI Order") at 2.  The
14 Redevelopment Plan's most recent amendment in 1991 authorized
15 the Redevelopment Agency to acquire all real property in the
16 project areas for development purposes, and to remove the
17 blighting influence of surrounding properties. Id.  To further
18 redevelopment of downtown Stockton, the City established "a
19 capital program" to demolish buildings and purchase properties
20 to expand available parking in the area. Id.

21     In June 2001, the City Council met in a closed session to
22 discuss the possibility of acquiring property in downtown
23 Stockton.  The City's acquisition list included twenty nine
24 downtown properties, including many SROs.[1] Id. at 2-3.

25 _____

26 [1]  The properties on defendants' acquisition list include various
single-room occupancy hotels located within the West End Project

                                  2

1  Two days after the City Council meeting, the City and its
2  Redevelopment Agency began a policy of zero tolerance for code
3  enforcement violations in downtown hotels. <u>Id.</u> at 3.  The City
4  Manager used the newly-created Community Health Action Team
5  ("CHAT"), a group composed of five City employees, two in the
6  Stockton Police Department and three in the Department of
7  Housing and Redevelopment, to implement its policy. <u>Id.</u>  Under
8  the policy, hotels that were cited with code enforcement
9  violations could not re-rent rooms that became vacant until all
10 code violations were corrected, without regard to the actual
11 health and safety threat of violations in particular rooms. <u>Id.</u>
12 If the hotels failed to correct these violations, the hotels had
13 to be vacated and closed. <u>Id.</u>

14      As part of their code enforcement scheme, defendants cited
15 sixteen of the twenty nine properties on defendants' 2001
16 acquisition list, which are all downtown SROs and lower income
17 apartments. <u>Id.</u> at 3-4.  Between July 2001 and December 2002,
18 defendants vacated and closed nine of the properties on their
19 acquisition list (the Commercial, Cosmos, Earle, El Tecolote,
20 James, La Verta, Mariposa, Steve's and Terry Hotels) plus the
21 Land Hotel (not on its acquisition list), resulting in the
22 removal of 351 lower income residential units from the West end
23 redevelopment Plan area. <u>Id.</u> at 4 and fn. 3; <u>see also</u> Decl. of

24 _____

25 area, including the Commercial, Cosmos, Delta, Earle, El Tecolote,
   Fair, James, La Verta, Mariposa, Merill, Oxford, Phoenix, Steve's,
26 Terry and Toni hotels, as well as the Hunter Apartments.  <u>Id.</u>

1  Deborah Collins in Support of Pl's Mot. to Amend PI (Collins

2  Dec.) ¶ 11, Ex. 10 at 637.

3       Plaintiffs allege that defendants continue to pursue their

4  downtown redevelopment plan by acquiring, demolishing, and

5  threatening to demolish many of the SROs that were closed.

6        Consistent with their redevelopment scheme, defendants

7  acquired the Terry Hotel and commenced an eminent domain action

8  against the Commercial Hotel in 2002. See PI Order at 25; see

9  also Burrows Dec. ¶ 14, Exs. 22, 23.  Both were purportedly

10 needed for public parking purposes. Id., see also Collins Dec.

11 ¶ 15, Ex. 14.[2]  The Toni Hotel was acquired on March 26, 2002 to

12 support parking for the Cineplex development (currently referred

13 to as the City Center Cinema Project).  Burrows Dec. ¶ 4, Exs.

14 11, 12;  ¶ 12, Ex. 20.  The City acquired El Tecolote on May 9,

15 2002, and the Earle Hotel on July 11, 2002.  Burrows Dec. ¶¶ 5,

16 6, Exs. 13, 14.   The City Council approved an agreement to

17 purchase the Main Hotel, also to provide parking in January

18 2003.  Collins Dec. ¶ 15, Ex. 14.  On October 5, 2004,

19 defendants obtained a condemnation order in their eminent domain

20 action against the La Verta Hotel. Burrows Dec. ¶ 8, Ex. 16.

21 ////

22 ////

23 ////

24 _____

25 [2]  In January 2003, staff reported to the City Council that it was
   still in the process of acquiring the Commercial Hotel "for the
26 purpose of parking expansion." Id.

                                4

The Land Hotel was acquired as part of the settlement and dismissal by the property owner of an action in this Court.[3]

Defendants demolished Hunter Apartments in April 2002, just prior to issuance of the Preliminary Injunction, for a loss of 24 lower income units. Collins Dec. ¶ 10, Ex. 9 at 570; Choi Dec. ¶ 3, Ex. 1.  In January 2003, the CHAT reported that demolition of the Mariposa and Steve's Hotels awaits "Federal Court ruling."  Collins Dec. ¶ 11, Ex. 10 at 642.

On December 14, 2004, the defendants approved the demolition of and shortly thereafter demolished the Toni hotel, resulting in the permanent loss of eight more SRO units. Burrows Dec. ¶ 3, Ex. 10; Burrows Dec. ¶¶ 12, 13, Exs. 20, 21. Plaintiffs allege that the defendant agency, however tardily, adopted a replacement housing plan for the eight Toni Hotel units to permit demolition to occur. Id.  According to plaintiffs, the Agency failed to assure that persons displaced by the downtown project have a priority for the purported eight "replacement" units.  See Burrows Dec. ¶¶ 12, 13, Exs. 20, 21; Decl. of Stanford Cobbs in Support of Pl's Mot. to Amend PI (Cobbs 2005 Dec.), ¶ 4; Decl. of Dwain Henderson in Support of Pl's Mot. to Amend PI (Henderson 2005 Dec.), ¶ 4.

Plaintiffs have submitted evidence indicating that additional low-income housing may soon be removed from the

---

[3]  The court may take judicial notice of the pleadings and record in the action, Portale v. City of Stockton, Case No. Civ. S-02-988 LKK/KJM.

5

market.  For example, in 2003, the Agency designated a square block that includes the Delta Hotel property as a Master Development Area and obtained a development proposal to construct a gated and landscaped parking lot that would extend right through the Delta parcel. Collins Dec. ¶ 17, 18, 19, Exs. 16, 17, 18.

According to the plaintiffs, at least 351 lower income units were removed from the affordable housing market as a result of the "code enforcement" closures in 2001 and 2002. Thirty-two lower income units (Hunter and Toni) have been demolished.  Another seven to eight SRO's, with a total of 349 units, already acquired by defendants remain at imminent risk of demolition.

## II.

### PROCEDURAL BACKGROUND

Plaintiffs filed this action in January 2002 against numerous defendants, including the City of Stockton and the Stockton Redevelopment Agency.  The suit sought declaratory and injunctive relief and a writ of mandate for alleged violations of state and federal relocation assistance, replacement housing, fair housing and other statutes claimed to be applicable to defendants' displacement of hundreds of downtown residents and closure of nine downtown SRO's.  See Compl.

In February 2002, plaintiffs sought a preliminary injunction to restrain defendants from vacating, converting and demolishing those residential units without providing adequate

1  relocation assistance or adopting and implementing replacement

2  housing plans.  Plaintiffs sought the Preliminary Injunction

3  pursuant to the federal Housing and Community Development Act

4  ("HCDA"), 42 U.S.C. §§ 5301 et seq., the California Relocation

5  Assistance Act, Cal. Gov't Code § 7260, and federal and state

6  fair housing statutes, 42 U.S.C. §§ 3601 et seq. and Cal. Gov't

7  Code §§ 12900 et seq.

8       Finding that plaintiffs were likely to succeed on the

9  merits of their HCDA § 104(d) and state law relocation

10  assistance claims, and that the balance of hardships tipped

11  decidedly in plaintiffs' favor, this Court issued a preliminary

12  injunction on May 2, 2002, as modified on June 14, 2002.  That

13  preliminary injunction restrained defendants, among other

14  things, from demolishing or converting any of the downtown

15  residential properties until they adopted and implemented a

16  valid replacement housing plan in accordance with HCDA.  See

17  Order dated May 2, 2002 at 36 ¶ 2; Order dated June 14, 2002

18  at 1 ¶ 1.  Determining that plaintiffs were likely to prevail on

19  their HCDA claims, the court did not reach plaintiffs' fair

20  housing claims.  Id. at 33-34.

21       Upon defendants' appeal, on December 6, 2004, the Ninth

22  Circuit affirmed the preliminary injunction order with respect

23  to the relocation assistance requirements.  Price v. City of

24  Stockton, 390 F.3d 1105, 1118 (9th Cir. 2004).  It reversed and

25  remanded, however, as to the court's prohibition of demolition

26  or conversion of the hotels absent a replacement housing plan

holding that plaintiffs cannot privately enforce the replacement

housing provisions of HCDA. Id. at 1113-14, 1118.

        In the present motion, plaintiffs assert that the

defendants are in violation of California's Community

Redevelopment Law (CRL), codified at Health and Safety Code

§§ 33000 et seq., the California Fair Housing & Employment Act

("FEHA"), Cal. Gov't Code §§ 12900 et seq., and the federal Fair

Housing Act, 42 U.S.C. §§ 3601 et seq.  Based upon that

contention, they seek to have the preliminary injunction amended

to prevent the demolition or conversion of the downtown single-

room occupancy hotels and apartments defendants removed from the

affordable housing market in 2001 and 2002, pending trial of the

action, unless they first adopt a lawful replacement housing

plan.

### III.

### STANDARD OF REVIEW

    The Ninth Circuit has adopted two tests for determining the

propriety of a preliminary injunction.  The moving party must

demonstrate either (1) a combination of probable success on the

merits and the possibility of irreparable injury or (2) that

serious questions are raised and the balance of hardships tips

sharply in favor of the moving party. Conn. Gen. Life Ins. Co.

v. New Images of Beverly Hills, 321 F.3d 878, 881 (9th Cir.

2003).  These two formulations are not different tests but

represent two points on a sliding scale in which the required

probability of success decreases as the degree of irreparable

1   harm increases.  <u>Oakland Tribune, Inc. v. Chronicle Publishing</u>

2   <u>Co.</u>, 762 F.2d 1374, 1376 (9th Cir. 1985).  In addition, a court

3   in either formulation of the test must also take into account

4   the public interests that are implicated by the relief sought

5   when it is balancing the harms.  <u>Caribbean Marine Services Co.</u>

6   <u>v. Baldrige</u>, 844 F.2d 668, 674 (9th Cir. 1988).

7        The California standard is quite similar to the federal

8   standard.  In deciding whether to issue a preliminary

9   injunction, a court must weigh two 'interrelated' factors: (1)

10  the likelihood that the moving party will ultimately prevail on

11  the merits and (2) the relative harm to the parties from the

12  issuance or non-issuance of the injunction. <u>Butt v. State of</u>

13  <u>California</u>, 4 Cal.4th 668, 677-78 (1992); <u>Cohen v. Board of</u>

14  <u>Supervisors</u>, 40 Cal.3d 277, 286 (1985).  "The trial court's

15  determination must be guided by a 'mix' of the potential-merit

16  and interim-harm factors; the greater the plaintiff's showing on

17  one, the less must be shown on the other to support an

18  injunction . . . ."  <u>Butt</u>, 4 Cal.4th at 677-78 (citations

19  omitted).

20                              **IV.**

21                            **ANALYSIS**

22       Plaintiffs contend that defendants' closure, acquisition,

23  and threatened demolition and conversion of the downtown SROs

24  are all part of defendants' West End Redevelopment Plan.  They

25  assert that, because the redevelopment project is the subject of

26  a written agreement between the Agency and the City, and the

1  Agency financially assisted the project, the Agency must adopt a

2  replacement housing plan pursuant to the CRL.  I examine these

3  contentions below.

4  **A.    THE COMMUNITY REDEVELOPMENT LAW**

5       The CRL provides that prior to removal of lower income

6  units from the affordable housing market as part of a

7  redevelopment project, redevelopment agencies must adopt a

8  replacement housing plan that will ensure the units are replaced

9  within four years of removal pursuant to Cal. Health & Safety

10  Code §§ 33413 and 33413.5.  In enacting the CRL, the state

11  legislature intended to protect and "to expand the supply of

12  low- and moderate-income housing." Cal. Health & Safety Code §

13  33071.  To assure the development of affordable housing,

14  redevelopment agencies are required to comply with CRL's

15  "inclusionary" or "production" requirements as part of certain

16  redevelopment plans. Id. at § 33413(b).  Specifically, the CRL

17  requires replacement of lower income housing that is destroyed

18  or removed from the housing market as part of a redevelopment

19  project.[4]   The "replacement" units must be available

20  _____

21  [4]  The statute provides:

22       Whenever dwelling units housing persons and families of
        low or moderate income are destroyed or removed from the
        low- and moderate-income housing market as part of a
23       redevelopment project that is subject to a written
        agreement with the agency or where financial assistance
24       has been provided by the agency, the agency shall,
        within four years of the destruction or removal,
25       rehabilitate, develop, or construct, or cause to be
        rehabilitated, developed, or constructed, for rental or
26       sale to persons and families of low or moderate income,

10

at an affordable housing cost at the same or a lower income

level as the persons displaced from the units that are destroyed

or removed. <u>Id</u>.[5]

Further, a redevelopment agency must adopt a replacement

housing plan well in advance of removing the units:

> Not less than 30 days prior to the execution of an
> agreement for acquisition of real property, or the
> execution of an agreement for the disposition and
> development of property, or the execution of an owner
> participation agreement, which agreement would lead to
> the destruction or removal of dwelling units from the
> low- and moderate-income housing market, the agency
> shall adopt by resolution a replacement housing plan
> . . . .

Cal. Health & Safety Code § 33413.5.  The plan must specify the

general location of the replacement housing units, an adequate

means of financing those units, the number of units housing

lower income persons and families that will be removed from the

market, and the timetable for meeting the plan's relocation,

rehabilitation and replacement housing obligations. <u>Id</u>.  Prior

---

> an equal number of replacement dwelling units that have
> an equal or greater number of bedrooms as those
> destroyed or removed units at affordable housing costs
> within the territorial jurisdiction of the agency
> . . . .

Cal. Health & Safety Code § 33413(a).

[5] If the units were removed or destroyed between September 1, 1989 and January 1, 2002, 75% of the replacement units were required to be affordable at the same or lower income levels as the persons displaced.  For any units removed or destroyed after January 1, 2002, 100% of the replacement units must be affordable to the persons displaced.  Further, the replacement units must be restricted by recorded covenants to remain affordable at such income categories for the longest feasible time, and not less than 55 years for rental units or 45 years for homeownership units. Cal. Health & Safety Code § 33413(c)(1).

1    to the adoption of the replacement housing plan, however, "the
2    agency shall make available a draft of the proposed . . . plan
3    for review and comment by the project area committee, other
4    public agencies, and the general public.  Id.  Thus, the CRL
5    provides a scheme to ensure both public participation and the
6    timely replacement of the lower income units at appropriate
7    affordability levels.

8        Finally, whenever any lower income housing units are
9    developed pursuant to Health & Safety Code § 33413, a
10   redevelopment agency must require by contract or other
11   appropriate means that the lower income families displaced by
12   the redevelopment project shall have a priority for renting or
13   buying the replacement housing. Id. at § 33411.3.  The agency
14   also must maintain a list of all persons entitled to such a
15   priority, and may establish reasonable rules for determining the
16   order or priority on the list.  Id.

17        1.    **Applicability of the CRL**

18        Defendants' primary defense against the plaintiffs' CRL
19   cause of action is that the replacement housing obligations are
20   not applicable to the defendant City.  The simple but fatal flaw
21   to this argument is that the plaintiffs never allege that the
22   City is burdened by such obligations, rather, they argue that it
23   is the defendant agency which must act.  While it is true that
24   plaintiffs contend that the City was the main protagonist behind
25   the challenged actions, they maintain that the City did not act
26   alone, since the actions at issue were part of downtown

1  redevelopment scheme agreed to by both the Agency and the City.
2  According to plaintiffs, the Agency's obligations under the CRL
3  were triggered by the City's actions because they acted in
4  concert.

5      Contrary to defendants' suggestion, the Agency cannot
6  escape obligations under § 33413 of the Cal. Health & Safety
7  Code simply because the City, and not the Agency, led the code
8  enforcement, closing, and demolition campaign.  The CRL makes
9  clear that the provisions of § 33413 are triggered and imposed
10 on the Agency whenever it is a party to a written agreement for
11 a redevelopment project that leads to the removal of low or
12 moderate income housing from housing market, which is
13 plaintiffs' actual allegation.  Cal. Health & Safety Code
14 § 33413(a).

15     The defendants also maintain that, even if City actions may
16 trigger the Agency's CRL responsibilities, the actions
17 complained of here cannot do so because they were independent
18 and separate from the downtown redevelopment plan.  They
19 maintain that the code enforcement and acquisition activities
20 had nothing to do with the redevelopment plan and were
21 undertaken only in the interest of protecting the health and
22 safety of Stockton's citizens, including plaintiffs.
23 Unfortunately for defendants, both this court and the Ninth
24 Circuit have already rejected this position.

25     This court has determined that the code enforcement
26 activities were likely "undertaken in connection with the

1  redevelopment of the downtown."  PI Order at 25.  As explained

2  in that order, both the Redevelopment Agency and the City of

3  Stockton adopted the West End Redevelopment Plan in 1961, which

4  was amended in 1991. Id. at 2.  The court found that, in pursuit

5  of the downtown redevelopment, the City created a property

6  acquisition list and thereafter it, "and its Redevelopment

7  Agency[,] began a policy of zero tolerance for code enforcement

8  violations in downtown hotels," using a "Community Health Action

9  Team ('CHAT')." Id. at 3.  After reviewing the defendants'

10  arguments, similar to the ones made here, the court concluded

11  that the "defendants' actions are likely part of a single

12  orchestrated redevelopment plan." Id. at 23, n. 14.  The Ninth

13  Circuit affirmed, stating that an abundance of evidence

14  supported plaintiffs' claims that the aggressive code

15  enforcement campaign by the CHAT against the downtown

16  residential hotels, acquisition, threatened demolition, and

17  conversion of the hotels to parking lots or other uses are all

18  part and parcel of defendants' West End Redevelopment Plan.

19  Specifically, that court noted that:

20      The [district] court . . . found . . . that the City's
        "redevelopment activities, which included code
21      enforcement, notices of vacating and demolition, and
        the acquisition of hotels through purchase and eminent
22      domain proceedings, amounted to a 'single
        undertaking.'" . . . Indeed, "the circumstances
23      strongly suggested" that 'the City's goals to
        redevelop downtown through acquisition of buildings in
24      the area . . . precipitated code enforcement." . . .
        Accordingly, the court concluded that Plaintiffs'
25      displacement occurred "in connection with" downtown
        redevelopment activities.  None of these findings are
26      clearly erroneous; indeed, all are amply supported by

1    evidence in the record.

2    Price v. City of Stockton, 390 F.3d at 1116 (quoting PI Order at

3    2-5, 21-25.)

4         Accordingly, because the code enforcement activities were

5    likely part of the downtown redevelopment project, plaintiffs

6    may properly seek to hold the Agency liable pursuant to

7    § 33413(a) based on those actions.

8         **2.   <u>Written Agreement</u>**

9         The defendants insist that the Agency cannot be held liable

10   for the City's code enforcement or SRO closing and acquisition

11   activities because the plaintiffs cannot point to any part of an

12   agreement entered into by the Agency that calls for those

13   specific activities.  As I explain, defendants' understanding of

14   § 33413 is too narrow and must be rejected.

15        Contrary to defendants' contentions, there is nothing in

16   the CRL that limits the Agency's § 33413 obligations to only

17   those agreements that specifically outline the removal of low-

18   incoming housing.  If that were the case, redevelopment agencies

19   would always be able to circumvent CRL's replacement housing

20   mandate by simply omitting housing removal language from such

21   agreements, even if the redevelopment project that is the

22   subject of the agreement would in fact inevitably lead to low

23   income housing removal.  The CRL's plain language clearly does

24   not allow for that result.  Section 33413 provides that whenever

25   low or moderate income housing is "destroyed or removed . . . as

26   part of a redevelopment project that is subject to a written

agreement with the agency or where financial assistance has been provided by the agency, the agency shall . . . rehabilitate, develop, or construct . . . replacement dwelling units."  Cal. Health & Safety Code § 33413(a).  Therefore, as long as any part of the redevelopment project results in the removal of low income housing, and the Agency is a party to a written agreement entered into pursuant to that redevelopment project, the Agency must comply with the CRL replacement housing obligations, regardless of which entity actually and directly does the removing.

Here, the plaintiffs have presented sufficient evidence supporting their contention that the Agency entered into an agreement concerning a redevelopment project that led to the removal of low and moderate income housing from the City of Stockton's housing market.  As the defendants necessarily concede, the Agency was a party to the West End Redevelopment Plan.  Plaintiffs allege, and the court has determined it likely, that the code enforcement and SRO closing and acquisition activities were part of that redevelopment project. Plaintiffs also point to evidence showing both that the Agency played an integral part in the execution of the redevelopment project and that the project has resulted in the displacement of low and moderate income housing.  In July 1998, the defendant City applied to the U.S. Department of Housing and Urban Development ("HUD") for an Economic Development Initiative ("EDI") grant and Section 108 loans to further the downtown

1 redevelopment project, to support the development of a multi-
2 modal transportation station, renovation of the Hotel Stockton,
3 development of a multi-screen movie cinema and retail complex,
4 renovation of the Fox Theater, and the Mercy Charities
5 affordable housing development.  Pinkerton Dec., ¶¶ 7, 9, 12;
6 Collins Dec., Exs. 2, 3, 7 and 11.  In the application, the City
7 acknowledged that "[t]he EDI and Section 108 funded projects
8 will require the relocation of approximately 200 residential
9 units and 37 businesses . . . ." Collins Dec., Ex. 2 at DEF
10 03155.  The City also identified the Redevelopment Agency as the
11 lead player in its redevelopment scheme, indicating that "[t]he
12 Redevelopment Agency has a long history of playing the
13 coordination role and as the Agency responsible for the
14 comprehensive project implementation. . . ." Id. at DEF 03185.
15 Therefore, the defendants cannot seriously dispute that the
16 Agency did not enter into an agreement of the type contemplated
17 by § 33413.

18     **2.**   **<u>Financial Support</u>**

19     I now examine plaintiffs' contention that the Agency is
20 also subject to § 33413 of the CRL because it provided financial
21 assistance for the redevelopment project which led to the
22 removal of low and moderate income housing.

23     Plaintiffs point to the City's EDI grant and § 108 loan
24 applications as proof that the Agency helped finance the
25 challenged activities. Collins Dec. ¶ 3, Ex. 2.  According to
26 that application, the Agency was to contribute over $2.7 million

1   as matching funds in support of the EDI application. Id. at DEF

2   03183, 03191.  Further, in May 2000, the City and the

3   Redevelopment Agency entered into an agreement whereby the City

4   agreed to grant $14.5 million to the Redevelopment Agency to

5   carry out the redevelopment project, and the Agency agreed to

6   assist the City, as needed, in repaying a $13 million § 108 loan

7   the City obtained from HUD.  Collins Dec. ¶ 6, Ex. 5 at 14682-

8   83.  The evidence indicates that the Agency provided matching

9   redevelopment funds of over $2.7 million for the EDI grant and

10  secured the § 108 loan.  Collins Dec., Ex. 2 at DEF 03183,

11  03191; Ex. 5 at DEF 15002-03.  Accordingly, plaintiffs have

12  sufficiently shown that the Agency financially supported the

13  redevelopment project at issue, thereby triggering § 33413(a).

14  **B.   CRL COMPLIANCE**

15       According to plaintiffs, defendants have violated the CRL

16  in at least three ways: (1) by failing to adopt a replacement

17  housing plan for the SRO's within the time line mandated by

18  § 33413.5, (2) by failing to adopt an adequate replacement

19  housing plan for the Toni Hotel units, and (3) by evading its

20  obligation to assure that the persons displaced to accommodate

21  the downtown redevelopment project actually receive a priority

22  for any replacement units developed pursuant to Health & Safety

23  Code § 33413.  I address these contentions below.

24       **1.   <u>Adoption of a Replacement Housing Plan</u>**

25       The CRL mandates that the defendant agency replace low and

26  moderate income units removed from the housing market as a

18

1  consequence of the redevelopment plan within four years.  Cal.

2  Health & Safety Code § 33413(a).  As noted above, to meet that

3  deadline, the agency must plan for the replacement well in

4  advance of the actual implementation of the redevelopment

5  project.

6      As plaintiffs assert, the defendants have long since

7  removed hundreds of lower-income residential units from the

8  affordable housing market.  See supra; PI Order at 4, fn. 3;

9  Collins Dec. ¶ 10, Ex. 9 at 570.  By virtue of the statute, the

10  replacement units should have been made available between June

11  2005 and May 2006, and the plan to meet that deadline should

12  have been adopted years ago.[6]

13      Defendants admit that, with the exception of the Toni

14  Hotel, the Agency has not adopted a replacement housing plan for

15  any of the units that were removed from the market during the

16  code enforcement phase of the project.  Defs.' Opp'n. at 23-25.

17  Therefore, because replacement plans were never adopted, the

18  hundreds of SROs should never have been removed from the low-

19  income housing market.  Section 33413.5 is unambiguous in

20  providing that:

21          A dwelling unit whose replacement is
           required by Section 33413 but for which no
22          replacement housing plan has been prepared,
           shall not be destroyed or removed from the

23

24  [6]  Plaintiffs also submit that § 33413.5 was triggered as early as
    May of 2000, when the City and the Agency entered into the
25  "Subrecipient Agreement" that secured the funding for the
    redevelopment project because it provided for the removal of at
26  least 200 residential units. Collins Dec. ¶6, Ex. 5 at 14682-83.

1                                  low- and moderate-income housing market
                                 until the agency has by resolution adopted a

2                                  replacement housing plan.

3 Health & Safety code § 33413.5.

4     Plaintiffs also assert that the Agency further violated the

5 CRL when it failed to timely adopt a replacement housing plan

6 for the Toni Hotel.  Defendants erroneously assert that the

7 replacement plan must be adopted "at least 30 days prior to

8 *implementing* a project."  Burrows Dec. ¶ 12, Ex. 20 at 425

9 (emphasis added).  The statute makes clear, however, that

10 defendants were required to adopt such a plan thirty days prior

11 to the *execution of the agreement* regarding the acquisition or

12 disposition of the hotel.  Because plaintiffs provide proof that

13 such an agreement was entered into as early as May, 2000,

14 Collins Dec. ¶ 20, Ex. 19; Burrows Dec. ¶ 12, Ex. 20, defendants

15 may have been required to be adopt a plan as early as April of

16 2000.[7]  Instead, however, defendant agency waited until December

17 14, 2004, on the eve of demolition, to adopt any replacement

18 housing plan for the eight Toni Hotel SRO units. Burrows Dec.

19 ¶ 12, Ex. 20.  Therefore, plaintiffs are likely to succeed on

20 their claim that defendant agency violated the CRL.

21 ////

22 ////

23 _____

24 [7]  Moreover, the offer to purchase the Toni Hotel was made on
November 27, 2001 (Collins Dec. ¶14, Ex. 13), and the Toni Hotel
site was deeded to the City on March 26, 2002.  Burrows Dec. ¶4,

25 Exs. 11, 12.  Thus, execution of the acquisition agreement, which
also can trigger the replacement planning obligation, occurred

26 sometime before March 26, 2002.

1          **2.     <u>Affordability Requirements</u>**

2          The CRL requires that replacement housing be made available

3   to the same or lower income levels as the residents that were

4   displaced.   Health & Safety Code § 33413.5.   The replacement

5   housing plan for the Toni Hotel provides that the former

6   residents of the Toni Hotel were all very low income, Burrows

7   Dec. ¶ 12, Ex. 20 at 430, and accordingly provides that the

8   replacement housing will be affordable to persons of that income

9   level.   Plaintiffs complain that defendants' income level

10  determination is inappropriately based on pure speculation.

11  According to plaintiffs, the former residents of the Toni Hotel

12  may have just as likely been persons with "extremely low,"

13  rather than very low incomes.   As such, the Toni Hotel

14  replacement units would not be affordable to those former

15  residents.

16         The defendants respond that replacing the plaintiffs'

17  proposed gradation of income level to include "extremely low

18  income" is nowhere contemplated by the CRL, and that instead,

19  the statute provides only for "very low income," "low income,"

20  and "moderate income."   As plaintiffs point out, however, the

21  term "very low income" expressly includes "extremely low income

22  households, as defined in [HSC] Section 50106. . . ." <u>See</u>

23  Health & Safety Code § 50105(b). It would appear the defendants

24  have a duty to ascertain the income level of those displaced,

25  and in the absence of evidence that they did so, plaintiffs may

26  well succeed on their claim that defendants violated section

                                  21

1  33413(a).

2  **3.  <u>Priority Requirements</u>**

3  Plaintiffs also contend that the defendant agency failed to

4  assure that any displaced persons will receive priority for any

5  replacement units produced or replaced, as required by

6  § 33411.3.  The named plaintiffs in this case assert that they

7  have never been notified by defendants of their right to have

8  priority for a replacement unit at the Hotel Stockton. Henderson

9  2005 Dec. ¶ 4; Cobbs 2005 Dec. ¶ 4.  Further, according to

10 plaintiffs, all 155 of the replacement units at the Hotel

11 Stockton are restricted to seniors and will only be affordable

12 to very low income persons, thereby denying all displaced

13 persons from a meaningful opportunity to obtain replacement

14 housing.  To highlight the detrimental impact of the housing

15 restriction, plaintiffs point out that approximately 70% of the

16 persons recorded on defendants' Relocation Assistance Log are

17 *not* seniors, and are therefore ineligible for the replacement

18 units.  Cobbs 2005 Dec. ¶ 3; Henderson 2005 Dec. ¶ 3.

19 The defendants dispute plaintiffs' contention by citing to

20 a declaration of Steven Pinkerton, director of the City's

21 Housing and Redevelopment department, who states that, although

22 Hotel Stockton was initially planned as senior housing, that

23 restriction was never realized. Pinkerton Decl. §§ 12-14.  The

24 record also contains evidence supporting plaintiffs' position,

25 however, rendering this issue a factual dispute.  For the

26 purposes of this motion, however, the court determines that the

1  plaintiffs may prevail on this claim.

2  **C.   IRREPARABLE INJURY**

3  Defendants contend that the relief sought by the plaintiffs

4  is unwarranted because they will suffer no irreparable harm

5  without it.  This court has previously found that defendants'

6  failure to comply with their replacement housing obligations law

7  "works a profound hardship" on plaintiffs. PI Order at 34.

8  Nothing suggests that conclusion was in error.

9  As set forth in the declarations of plaintiffs Henderson

10 and Cobbs, defendants' failure to comply with the CRL has

11 resulted in repeated instances of homelessness for Henderson.

12 Henderson 2005 Dec. ¶ 5; Cobbs 2005 Dec. ¶ 5.  The destruction

13 of additional units of low income housing units without an

14 adequate plan for replacement or reasonable and timely steps to

15 ensure that plaintiffs will receive the benefit of a priority

16 for any newly-developed units continues to threaten plaintiffs

17 with recurring and protracted homelessness.

18 Defendants insist that presently plaintiffs will suffer

19 only a "harmless delay" in awaiting replacement of their homes.

20 See Defs.' Opp'n. at 4-5.  Given the circumstances, any delay

21 threatens displacement and homelessness.[8]

22

23 [8]  In any event, defendants heartless argument rests on a
   misreading of the law.  Defendants' argument is premised on the
24 notion that even if the Agency adopted a replacement housing plan,
   it would have four years from the date of *demolition* to replace the
25 units, which defendants estimate to be 2009 or 2010.  As explained
   above, that calculation is incorrect as to many of the buildings
26 that have already been vacated.

1    Regarding SROs that are in danger of future vacation, the
2    defendants concede that, without the requested amendment, the
3    replacement housing may be delayed by six months.  According to
4    defendants, "[i]t is hard to see how any of the plaintiffs would
5    be irreparably harmed by that kind of delay." Defs.' Opp'n at 5.
6    Sadly, defendants continue to fail to come to grips with the
7    harm that plaintiffs will likely suffer from what defendants
8    characterize as a short delay in replacement housing, giving
9    this court even more cause for concern.  Although it may "be
10   hard" for the defendants to "see" how even short-term
11   homelessness can cause harm, in this court's view, it does not
12   take more than common sense to understand the extent of that
13   hardship.
14   First, it is likely that many of the displacees may not
15   find or be able to afford temporary housing while they await
16   their replacement housing to become available.  Indeed,
17   "plaintiff Henderson has experienced repeated bouts of
18   homelessness since his displacement" while awaiting a
19   replacement units.  Henderson Dec. ¶ 5.  Further, plaintiffs
20   Watson and White have had difficulty in securing an affordable,
21   permanent home. Decls. of Lucinda Watson and Lance White in
22   Supp. of Pls' Mot. to Amend PI (Watson Dec. ¶¶ 3, 4); (White
23   Dec. ¶¶ 2, 3, 6).  Such short-term homelessness may result in
24   plaintiffs living in conditions even more deplorable than those
25   found in the units closed by defendants, exposing plaintiffs to
26   illness and other dangers.  Further, the loss of opportunity to

24

1   live in replacement housing that is safe, sanitary, decent and

2   integrated and that is accessible to jobs cannot be

3   underestimated.  As put by one court, short-term homelessness

4   can mean the loss of that opportunity "'to escape the never-

5   ending and seemingly unbreakable cycle of poverty.'" <u>Gresham v.</u>

6   <u>Windrush Partners, Ltd.</u>, 730 F.2d 1417, 1424 (quoting <u>Banks v.</u>

7   <u>Perk</u>, 341 F. Supp. 1175, 1185 (N.D. Ohio 1972), <u>aff'd in part</u>

8   <u>and rev'd in part</u>, 473 F.2d 910 (6th Cir. 1973)).

9         Moreover, the defendants overlook the harm that stems from

10   depriving plaintiffs of their procedural rights to review and

11   comment on a replacement plan *before* any of the hotels are

12   demolished.  Health & Safety Code § 33413.5.  As noted, a

13   replacement housing plan must demonstrate where the replacement

14   units will be located, the number and affordability levels of

15   the units to be removed and replaced, and that adequate

16   financing is or will be available to replace the units in a

17   timely manner. <u>Id.</u>  The proposed housing replacement plan must

18   be made available for review and comment by a Project Area

19   Committee (PAC) comprised of residents, businesses and

20   organizations within the project area, other public agencies and

21   the public. <u>Id.</u>; <u>see also</u> Health & Safety Code § 33385.  Were

22   defendants permitted to continue to remove low and moderate

23   income housing from the housing market, plaintiffs would plainly

24   be deprived of their right to comment on and advocate for a

25   responsible replacement housing plan.

26   ////

25

1      It is unclear to this court what harm defendants will

2   suffer from being required to obey state law.[9]  In any event,

3   plaintiffs' harm far outweighs any hardship defendants may

4   suffer.

5      Plaintiffs have overwhelmingly shown a likelihood that they

6   will succeed on the merits of their CRL claim and that there is

7   a high likelihood that they will suffer irreparable injury.

8   Because plaintiffs request the same relief pursuant to their

9   federal and state fair housing claims, it is unnecessary for the

10  court to reach the merits of those claims.

11                              **V.**

12                          **CONCLUSION**

13     The plaintiffs' motion to amend is GRANTED.  Clause two of

14  the preliminary injunctive order dated May 2, 2002 is hereby

15  amended and shall now read:  Defendants are ENJOINED from

16  vacating, demolishing, or converting residential hotels and

17  motels in the downtown Stockton areas, including those located

18  in the West End Urban Renewal Project area.  The injunction

19  shall remain in effect until the defendants adopt and implement

20  a replacement housing plan and relocation assistance plan in

21  ////

22  ////

23  ////

24  ――――――――――――――――

25  [9]  I must admit to finding it grotesque to seriously suggest that
    a political subdivision of the state will suffer cognizable harm
26  from being required to obey state law.

1  accordance with Health & Safety Code §§ 33413, 33413.5, 33411.3

2  and 42 U.S.C. § 5304(d), or further order of the court.

3      IT IS SO ORDERED.

4      DATED:  August 9, 2005.

5

6                              /s/Lawrence K. Karlton
                               LAWRENCE K. KARLTON
7                              SENIOR JUDGE
                               UNITED STATES DISTRICT COURT
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27